SCOTT et al. v. FISHER KNITTING MACH. CO. et al. SAME v. REGAL TEXTILE CO. et al. SAME v. FISHER KNIT GOODS CO. et al. SAME v. SEAL BACK UNDERWEAR CO. et al.

(Circuit Court of Appeals, Second Circuit. May 22, 1906.)

Nos. 163–166.

PATENTS—INFRINGEMENT—KNITTING MACHINES.

The Bellis patent, No. 561,559, for a knitting machine capable of producing loops on a ribbed fabric adapted to be fleeced, is one of primary character, covering a meritorious invention, and entitled to a broad construction, and is infringed by the machine of the Fisher patent, No. 656,535.

Appeal from the Circuit Court of the United States for the District of New York.

This cause comes here upon appeal from a decree dismissing bill charging infringement of claims 1, 3, 6, and 7 of complainants' patent No. 561,559, granted to David C. Bellis June 9, 1896, for a knitting machine.

For opinion below, see 139 Fed. 137.

Hubert Howson and Charles Howson, for appellants.
Charles Neave and Alfred Wilkinson, for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The art discussed herein relates to knitted fabrics and the machines by which they are produced. The patent in suit covers a machine for producing a heavy knit material, capable of use in making winter undergarments. Its construction is fully explained in the opinion of the court below. 139 Fed. 137.

The claims in suit are as follows:

"(1) A knitting. machine having two sets of needles and cams therefor for producing ribbed fabrics, jacks or loopers, cams and a bed therefor, operated by the driving mechanism of said machine to interlace a supplemental thread with the meshes produced by the said needles, substantially as and for the purposes set forth. * * * "

"(3) A circular knitting machine having two sets of needles, needle-cylinder, cam-cylinder, needle-dial, and cam-dial, together with jacks or loopers operatively mounted in grooves of a jack-bed, fastened to the needle-dial, and cams adapted to operate the said jacks or loopers in conjunction with the said needles, to interlace a supplemental thread with the meshes produced by the said needles, substantially as and for the purposes set forth. * * * "

"(6) A circular knitting machine having two sets of needles and means for operating the same, a system of loopers or jacks operated by cams to interlace a supplemental thread with the meshes produced by the said needles, and means for supplying the said loopers with yarn, substantially as and for the purposes set forth.

"(7) In a circular rib knitting machine the combination of two sets of needles, a cylinder, and a dial therefor, a system of loopers or jacks, guided in slots of the said dial, a bed for said loopers or jacks, and means for operating the said needles and loopers, substantially as and for the purposes set forth."

Bellis was the first to produce "a fleecing ribber" and the new fabric known as "fleece rib." Machines for producing a fleecy inner face on plain knit fabrics had been known for some 13 years prior to the invention of the patent in suit. Ribbed goods had been fleeced by carding the body threads. But plain knit fabrics were inelastic, and carding the body threads weakened the garment. The demand for a fabric which would obviate these objections is indicated by the commercial success of complainants' and defendants' manufactures. That the construction of a machine capable of producing such a fabric was not obvious appears from the 31 prior patents introduced by defendants, no one of which showed a solution of the problem, and from the inability of defendants' experts to construct from the prior art any practical fleecing ribber, or to satisfactorily indicate how the prior structures could be so adapted as to produce a fleece rib, without radical and substantial modifications, involving the exercise of invention, and by the further very significant facts that the Scott patents, Nos. 577,788 and 577,789, for rib knitting machines, applied for prior to the issue of the Bellis patent, proceeded upon a theory, and were constructed upon a plan, radically different from the suggestions furnished by the prior art as testified to by defendants' experts, and that, after the Bellis disclosures, Scott abandoned his former construction, followed Bellis, and finally secured a half interest in the Bellis patent.

The only prior limiting machine material to this discussion is that of the Cooper & Ford, British Patent No. 172, of 1887. But this was a plain nonribbing knitter, provided with loopers, and if the second set of needles be added thereto in order to make a ribbed fabric, it

would not operate as a looper at all. The solution of the problem is not accomplished by the introduction of another set of knitting needles into said Cooper & Ford or the prior Sturgess & Hearth machines, because in each of them, as is admitted by defendants' expert:

"The stretches of supplemental thread which would be exposed on the unribbed fabric would be imbedded and inwrapped within the fabric when made ribbed by the addition of a second set of needles."

Nor is the solution of the problem furthered by the ribbed fabric machines of the prior art. The closest of them (that of Lecaisne, of 1892), which laid an extra thread in the fabric, need not be discussed, because it was not enumerated by defendants' expert in his list of 10 specially pertinent patents, because it is not a looper, and furnishes no suggestion of means for making loops, and because Cooper & Ford in the second patent, chiefly relied on by defendants, abandoned Lecaisne in order to produce a looper. This, therefore, is a case where, so far as concerns machines for making the new fabric, there is no prior art, and, so far as concerns machines for making the old fabrics, they apparently, at most, failed to furnish any suggestion of adaptation to the new purpose, but, as complainants claim, and there is some evidence to support the claim, their construction would tend to lead the inventor away from, rather than toward, the right path for the attainment of the object sought.

The arguments directed to a limitation of the scope of the patent in suit consist, first, in the following criticisms of its language, in connection with that of Bellis' fabric patent, No. 561,559. His object was to construct "a machine which is capable of producing a ribbed knit fabric with backing," described in his patent therefor, consisting of "a two-ply rib knit webbing," or provided with "a backing on the ribbed knit fabric, which may be of a different material from that of which the body of the fabric is composed," to be introduced "while the latter is being produced." The result, the production of a "ribbed knit fabric with backing," was accomplished by means of "jacks or loopers operated to act in conjunction with the needles to interlace a supplemental thread with the meshes composing the body of the ribbed fabric." "But to produce a backing on such fabric while the latter is being produced devices must be provided which bring the backing or supplemental thread from the inside of the machine over the needles at certain and predetermined intervals, so that it may be interlaced with the meshes of the fabric as will be hereinafter more fully described," and the jacks must rise to push the thread "over a needle, to be interlaced with a mesh formed by such needle." There is no statement in the patent that its object was to construct a machine capable of producing loops to be fleeced.

It is admitted that the machine of the patent in suit makes a fabric described in the Bellis fabric patent as one which can be finished in one operation, and that when so finished it is a completed article, with a substantial backing before it is fleeced, while defendants' fabric has only floating loops for its backing, and is not a completed article until it has been fleeced.

It is further admitted that there are substantial differences in the construction and operation of the two machines, and that the construction of defendants' machine follows in certain details the machines of the prior art.

In the light of these facts we are brought to a consideration of the status and scope of the patent in suit and of the single issue in the case—that of infringement. The criticisms upon the language of the patent itself will first be considered.

It is objected that there is no reference in the specification to the fact that the object of the invention was to produce a fabric capable of being fleeced. But it is well settled that the patentee is not obliged to state all the objects of his invention, and that he is protected in all the beneficial uses thereof within its scope; and here no statement as to fleecing was necessary, because the patent in suit concerned only a new "improved ribbed knit fabric, * * * produced and finished in one operation" (patent No. 561,558) on the patented machine. Whether it should thereafter be used as thus finished, or subjected to a new operation for fleecing, was immaterial. Furthermore, such a construction for fleecing was old in plain knit goods. There is no evidence that the fabric was ever practically used for any other purpose, and the uncontradicted testimony is that this was the sole purpose to which the invention related.

The references to making the backing of different material are criticised by defendants as referring merely to a double-faced material. But such references might equally well suggest a fabric adapted for fleecing, such as a cotton body with a fleece lining of wool. It is contended that while the stated object of the invention in suit was such that the "extra thread is tightly interlaced with the loops," etc., "* * * whereas Fisher's [defendants'] extra thread is not interlaced, is not secured to the main fabric at all," etc. But the Fisher patent specifically describes means "to engage with an extra thread and secure it on one surface of the fabric, forming floating loops," and explains how said loops are "caught on the inside of the fabric by the loops of the main thread." Whether the defendants' thread is not in fact interlaced will be discussed later.

Much stress is laid on the language quoted above which indicates that the supplemental thread must be brought "from the inside of the machine over the needles," etc. But a reference to the specification shows that this statement was made in the course of a description by the patentee of the specific machine illustrated in the drawings, and that such limitation is nowhere else found, except in claim 5, not here in suit, but which covers this specific construction.

But it is argued that, as Bellis insists that however his machine be modified it must be "provided with jacks or similar devices to bring a thread over a needle to be interlaced with a mesh formed by such needle" and as defendants do not thus manipulate their thread, and do not interlace the loop in the body of the fabric, they do not infringe. The differences in the operation of the two machines and in the construction of the loop are fairly shown by the following diagrams and citations from complainants' brief:

# COMPLAINANTS' MACHINE

EXTRA THREAD

DIAL NEEDLE

CYLINDER NEEDLE

LOOPERS

# DEFENDANTS' MACHINE

DIAL NEEDLES

LOOPER   CYLINDER   LOOPER
          NEEDLE

IN EACH MACHINE THE JACKS BRING A "THREAD W OVER A NEEDLE" (AT TOP CREST X) "TO BE INTERLACED WITH A MESH FORMED BY SUCH NEEDLE;"

IN EACH MACHINE THE LOWER OR INNER LOOP Y IS BOTH FORMED AND RETAINED WITHIN THE ANGLE FORMED BY THE TWO SETS OF NEEDLES.

"In the Exhibit Bellis Machine the loopers take the supplemental thread, and push it up against the shanks of the dial needles, lifting the junctions of the loops into the path of the cylinder needles, which rise through them; and thereby two things are done, to wit; (1) to form within the angle of the two sets of needles the loops of supplemental thread which are to constitute the backing in the finished fabric, and (2) 'to bring the thread, w, over a (cylinder) needle 'to be interlaced with a mesh formed by such needle.' Bellis patent, p. 3, line 80. When later, the old loops of body thread on the cylinder needles are 'cast off,' the parts of the supplemental thread over the cylinder needles are cast off with them, resulting in the interlacing of the supplemental thread with the meshes formed by the cylinder needles, or, as the Fisher patent describes it, the extra thread is secured 'on one surface of the fabric, forming floating loops.'

"In the defendants' machine the loopers take the supplemental thread, and bring it over the shanks of the dial needles, and press it down between those needles, and thereby the same two things above mentioned as in the Bellis machine are done, to wit; (1) to form within the angle of the two sets of needles the loops of supplemental thread which are to constitute the backing in the finished fabric, and (2) 'to bring the thread, w, over a (dial) needle to be interlaced with a mesh formed by such needle.' Bellis patent, p. 3, line 80. When, later, the old loops of body thread on the dial needles are 'cast off,' the parts of the supplemental thread over the dial needles are cast off with them, resulting in the interlacing of the supplemental thread with the meshes formed by the dial needles, or, as the Fisher patent describes it, the extra thread is secured 'on one surface of the fabric, forming floating loops.'

"In both complainants' and defendants' machines, it is the upper crest of the crinkled supplemental thread (in black in diagram) which is brought over and lies outside the needles, and is afterwards caught into or interlaced with the meshes of the fabric, and in both machines it is the lower or bottom wave of the crinkled supplemental thread which is inside the angle of the two sets of needles, and which afterwards becomes the backing or floating loop in the fabric. In one case the thread is caught into or interlaced with the meshes formed by the cylinder needles and in the other case with the meshes formed by the dial needles. In other words, the fabric from defendants' machine has the looped supplemental thread interlaced with the front wales of the fabric, while the fabric from the Exhibit Bellis Machine has the looped supplemental thread interlaced with the rear wales, that is, when you look at the fabric on its looped face. * * * "Defendants say that Fisher's loopers cooperate with one set of needles only—the dial needles. Fisher's loopers cooperate also with his cylinder needles, because these loopers, after bringing the thread down over the dial needles to form the crinkle, as shown in his Fig. V, continue to hold down the thread in loops, not only until it has been cast off the dial needles with the loops of body thread, but the loopers still continue to hold down the extra thread loops after they have been brought down onto the loops of body thread of the cylinder needles, until tied in by the loops cast off by the latter, and furthermore the loopers are then 'further depressed a trifle to tighten the extra thread loops' (Fisher patent, p. 318, lines 33–34). As will be seen by the shape of the looper cam, in Fig. IV of Fisher patent (p. 326), the loopers are held down all the way round the cylinder, except where momentarily raised (by cam 31) to take the extra thread from guide eye 34. Fisher's loopers thus do co-operate with both sets of needles by first forming the extra thread loops over the dial needles, and by holding those loops onto the loops formed by the cylinder needles until the extra loops have been tied in.

"In both the machine of the Bellis patent sued upon and defendants' machine, the shanks of the dial needles act in conjunction with the loopers to form the loops of the supplemental thread that are to be engaged with the knit fabric, and in both it requires the co-operation of both sets of needles and the loopers in order to form the said loops, and to cause them to be engaged with the fabric, so that the loops of supplemental thread will project from the back of the fabric to form the backing therefor, as is desired in the product of the machine."

The Bellis loop is formed by having the extra thread pushed against the dial needles and out over the cylinder needles. The Fisher loop is formed by having the extra thread pushed against and over and down between the dial needles carrying a body thread. When the dial needle withdraws, the body and supplemental threads are cast off together, and thereby the two become interlaced. This operation is described in the Fisher patent as follows:

"As the dial needles continue their outward movement, the extra thread slips back over the ends of the latches onto the shanks of the needles, where it is left with just a trifle of slack, so that as the dial needles move in again, having engaged with the main thread, they draw it easily under the extra thread, which is cast off over the needle hooks at the same time as one loop of the main thread, and is caught on the inside of the fabric by the loops of the main thread."

The operation and result of the two devices thus differ in that in the one the supplemental thread is pushed from the inside outward over the cylinder needles, and thereby firmly interlaced in the body of the fabric; in the other the supplementary thread is pushed in from the outside, and interlaced, "secured," or "caught on the inside of the fabric," as the patentee says.

In the light of the foregoing discussion, it is seen that not only was Bellis the first to produce a fleecing ribber and a fleece rib, but he was the first to produce a machine which interlaced loops on a double ribbed fabric. He was the first to conceive a practical method and means for obviating the mechanical difficulties attendant upon the introduction of the extra needles. It may, therefore, fairly be said that he fulfilled the requirements of a generic invention, in that he devised a machine which performed the function of looping on a ribbed fabric, a function never performed thereon by any earlier machine, and thereby produced a result never before produced, namely, a ribbed fabric capable of being fleeced, and that in doing this he exercised invention of a high order. And inasmuch as there is no prior art limiting Bellis as the first to produce a machine capable of providing loops on a ribbed fabric adapted to be fleeced, we think his invention is entitled to be regarded as of such primary character as to embrace defendants' machine, which performs the same functions of looping and engaging a thread in the fabric by a combination of means covered by the terms of the claims in suit, and operating on the same principle, with the same resulting fleecing capacity.

It is argued by defendants, and found by the court below, that the Bellis invention is not a meritorious one because its machines are inoperative or impracticable for successful commercial operation. This argument rests upon the following contentions: Bellis, in his subsequent patent, No. 574,129, for an improvement, consisting in the addition of a ring to his prior machine, says as follows:

"The upper peripheral edge, s, of the ring, S, also serves to direct the finished fabric, which is drawn by suitable takeups, downward, so that the newly formed backing loops do not come into the way of the jacks to be next actuated, which, as has been found, was the case where no such ring, S, was provided on the machine, the jacks on such machines generally catching the

loop previously formed, and tearing on its upward motion the threads apart, destroying in this way the backing, but this is entirely obviated by the use of the said ring, S."

All the Bellis machines, with perhaps one exception, are provided with this ring. Scott & Williams, the owners of one half of the patent in suit, have patented and make a different machine, and certain hostile experts testify that in their opinion the Bellis machine is impracticable for various reasons.

This last contention is met by proof that the Bellis machines with the ring improvement have been in successful commercial operation for some eight years, and the theories advanced to show why the Bellis machines would not run successfully are denied by witnesses who claim to testify from actual observation.

The Scott & Williams machines are different in some particulars from the specific construction of the patent, but the testimony of complainants' experts, not disproved by defendants, is to the effect that these machines are within the patented construction. The patented ring is an improvement on the original machine, and remedies a defect therein. But this is a mere detail improvement, and, in effect, merely amounts to an enlargement of the dial of the patent. We are unable to see, therefore, how it affects the meritorious character of the invention. It is frequently a characteristic of generic inventions that their first embodiments work imperfectly, and where the imperfections may be remedied, as in this case, by what amounts to a mere readjustment of relative sizes, such change does not affect the character of the underlying creative conception. In these circumstances, the majority of the court is of the opinion that the decree of the court below as to the defendant corporation must be reversed, with costs.

Inasmuch as it does not appear that the defendant Kerman has any connection with the infringement, except as an officer of said corporation, the bill should be dismissed as to him, with costs. Hutter v. De. Q. Bottle Stopper Co., 128 Fed. 283, 62 C. C. A. 652.

The cause is remanded to the Circuit Court, with instructions to enter a decree in accordance with this opinion.