MALLINCKRODT CHEMICAL WORKS v.
E. R. SQUIBB & SONS.

No. 1287.

District Court, W. D. Missouri, W. D.

Oct. 1, 1932.

Frank Y. Gladney and Rippey & Kingsland, all of St. Louis, Mo., and Hale Houts, of Kansas City, Mo., for plaintiff.

W. Brown Morton and E. H. Merchant, both of New York City, and C. W. German, of Kansas City, Mo., for defendant.

REEVES, District Judge.

This is a suit for an alleged infringement of United States patent No. 1,370,865, granted March 8, 1921, to Frederick Westerbeck, but now owned by plaintiff, Mallinckrodt Chemical Works, a corporation.

The bill seeks an injunction against the defendant and prays for an accounting of profits.

The defendant, on its part, denies infringement, challenges the validity of the patent for lack of invention, in view of the prior state of the art, and asserts anticipation by patent No. 260,432, granted to Francis A. Walsh July 4, 1882. The defendant asserts that even if valid, its limitations were such, in view of the prior state of the art, that the structure or mechanical closure employed by defendant is easily distinguished and that in consequence there is no infringement.

The patent under consideration is a mechanical combination for an efficient seal and relates "to closures for sheet metal vessels applied without the use of solder, the invention being of special merit in hermetically sealing sheet metal cans containing ether or other volatile and inflammable liquids."

It was the contention of plaintiff, and its evidence tended to show, that for many years previous to the introduction of its mechanical combination for closure of containers ether was either placed in glass containers or metal containers sealed by a process of soldering. This method of confining ether was attended with hazard on account of its inflammable and volatile nature. Glass stoppers were not practical and the ether having fluidity four times that of water would imperceptibly escape around glass stoppers or acting as a solvent upon other stoppers would create an opening for its escape. Ether will boil or become gaseous at a very low temperature and being inflammable the use of solder in sealing the container is fraught with grave danger of fire. Moreover, the contents are liable to adulteration from the flux of the solder.

Prior to 1880, glass containers were chiefly used. Such were easily broken and transportation was made hazardous from breakage and, as above stated, loss from evaporation.

The character of ether and the difficulties that confronted those engaged in handling it were expressed by Dr. E. R. Squibb, the predecessor of the defendant, in 1872 in an article appearing in a trade journal as follows:

"This stronger ether is especially prepared for use as an anaesthetic, with much care and pains; and the extreme volatility which particularly adapts it to the production of anaesthesia makes it very difficult to secure for transportation and very inflammable. Glass stoppers cannot be ground in quantity at any reasonable cost which will secure it against loss by evaporation.

"Corks secure it best while standing at rest or during its application, but by the agi-

tation of transportation, or by long standing, they become so shrunken and condensed as to admit a considerable loss at best, while the bottle sometimes reaches its destination apparently well secured, but entirely empty. Hence, when ordered in bottles, either glass stoppered or corked, it must be entirely at the risk of the buyer."

"A much better way of putting up—and by far the best that has yet been devised—is in tin cans with a sheet or cap of thick tin foil soldered over the mouth."

Thirteen years later, or in 1885, Dr. Squibb again expressed the difficulty of handling ether as follows:

"No method of transporting or using ether has ever been devised that is at all equal to soldering it up in tin, and it is very curious and irrational that this method now in use for many years should have proved so unsatisfactory as to prevent its general adoption. It is, beyond doubt, the only proper method of putting up and transporting ether, because by it the ether is wholly preserved in a perfect condition, and is transported and used with general safety—or at least with the smallest possible risk."

The testimony tended to show that while the transportation of ether thus placed in containers was attended with comparative safety, yet the objection to the soldering method was the fire hazard and the risk of introducing impurities into the ether from the soldering fluid.

It was the object of the chemist to accomplish chemical purity, as well as safety. It appeared that this problem not only confronted chemists and manufacturers, but that the patentee for many years had struggled to overcome what appeared to be danger and hazard attending the securing or confining of ether. Because of its extreme fluidity and volatility, ether was more difficult to confine than any other substance. Containers hermetically sealed for all practical purposes as to other substances or elements were wholly ineffective and inefficient as relates to ether.

The Walsh patent appertained to the closure of paint cans. Paint, as is well known, has viscosity rather than fluidity and the Walsh patent, by means of interlocking edges of the metal closure part and the pouring neck, was able to effect such a seal of the container as to make it efficient for that particular purpose.

In like manner an English patent of a later date, to wit, 1897, provided for the closure of metal containers filled with food products. Both paint and food products lacked the fluidity of ether. In each case provision was made for a soft metal cap with the object of facility in opening the can, so as to pour out the contents. These patents antedated plaintiff's patent by many years. Notwithstanding the fact that these mechanical combinations were known and in extensive use, yet they were not used in an effort to confine or hermetically seal metal containers filled with ether. In 1921 the patent admittedly owned by plaintiff was granted. Claims one and two thereof are as follows:

"1. A container provided with a closure-receiving member having an annular sealing flange provided with a sharp annular edge, a soft metal cap seated on said sealing flange and having a depending soft metal flange surrounding said sharp annular edge, and a binding band closely fitted to said soft metal cap at a point directly opposite said sharp edge and having its margins turned inwardly to closely confine the soft metal against the upper and lower faces of said sealing flange, marginal portions of said soft metal cap being interposed directly between said binding band and the sharp annular edge, and said sharp edge being embedded in said soft metal cap.

"2. A container provided with a closure-receiving member having an annular sealing flange provided with a sharp annular edge, a soft metal cap seated on said sealing flange and having a depending soft metal flange surrounding said sharp annular edge, and a binding band closely fitted to said soft metal cap at a point directly opposite said sharp edge and having its margins turned inwardly to closely confine the soft metal against the upper and lower faces of said sealing flange, marginal portions of said soft metal cap being interposed directly between said binding band and the sharp annular edge, and said sharp edge being embedded in said soft metal cap, said binding band being in the form of an endless ring approximately U-shaped in cross section, so as to embrace said sealing flange and the margin of said soft metal cap, and said soft metal cap being exposed inside of said ring to receive an instrument for cutting the soft metal."

These are the only two claims in issue. It will be observed that the patent purports to cover sheet metal cans having a closure of soft metal secured to the can by a ring of harder metal. The closure was accomplished by interlocking the edges of the several parts and, on account of the soft metal of the cap and the sharp harder edge of the pouring

neck, the sharp edges of the pouring neck and the binding band were imbedded in the soft metal cap. According to the evidence, this was efficient in hermetically sealing ether cans.

After the patent in suit was granted, the defendant quit its former method of soldering and employed a mechanical combination similar to that embodied in plaintiff's patent.

Other facts, if they become pertinent, will be stated in the course of this memorandum opinion.

1. On the question of validity of the patent, the court must indulge the presumption of validity; that it possesses utility and embodies invention. Minneapolis, St. P. & S. S. M. Ry. Co. v. Barnett & Record Company (C. C. A.) 257 F. 302; Galvin Electric Mfg. Co. v. Emerson Electric Mfg. Co. (C. C. A.) 19 F.(2d) 885; Luten v. Kansas City Bridge Co. (C. C. A.) 285 F. 840.

This presumption is strengthened by the circumstance that the defendant has cited in its answer a great number of patents alleged to have anticipated or narrowed the art. Moreover, there is the further supporting circumstance that the defendant has since the issuance of plaintiff's patent employed a seal or combination very similar to that embodied in the patent. Forsyth v. Garlock (C. C. A.) 142 F. 461; Naylor v. Alsop Process Co. (C. C. A.) 168 F. 911.

Relating to the subject of imitation, the Supreme Court in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, loc. cit. 441, 31 S. Ct. 444, 450, 55 L. Ed. 527, said:

"It (the defendant) gives the tribute of its praise to the prior art; it gives the Grant tire the tribute of its imitation, as others have done."

Furthermore, it appeared from the evidence that the defendant advertised its seal as an improvement and placed upon its can a statement that it too had applied for a patent. The defendant, under such circumstances, could hardly be heard to dispute the validity of plaintiff's patent. David et al. v. Harris (C. C. A.) 206 F. 902; Hiler Audio Corporation v. General Radio Co. (D. C.) 26 F.(2d) 475.

According to the evidence, the combination involved in plaintiff's patent became popular and was immediately put in use extensively, both by the plaintiff and defendant. This, too, aids the presumption of patentability. Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Vacuum Cleaner Co. v. American Rotary Valve Co. (D. C.) 227 F. 998.

The foregoing is true notwithstanding the fact that each of the elements involved in the patent may be old. If the particular combination of elements produces a new and useful result, then the article is patentable.

2. The parties have favored the court with many drawings and exhibits, each one exemplifying patented containers used by the parties and others.

A careful examination of each of these exhibits fails to disclose the slightest difference in the combinations used. The closure is accomplished by interlocking the edges of the various metal parts and the employment of a soft metal cap so that upon pressure, and with the use of an appropriate instrument, the harder edges of the metal parts become embedded in the soft portions of the metal cap.

This combination was a substitute for soldering. According to the evidence it was not only far more efficient but much safer. The use of a mechanical closure facilitated very greatly the safe bottling of ether. In this case the matters in controversy were before the court and the court is of the opinion that the combinations were identical. As was said in Globe Knitting Works v. Segal (C. C. A.) 248 F. 495, loc. cit. 498:

"The mere inspection of the two garments determines the question of infringement. In looking at them and comparing them in the light of the testimony, we cannot escape the conclusion that the garment of the defendants corresponds precisely in elements and substantially in detail with the claims of the patent. The parts are the same, they are in the same positions and relation, are intended for the same uses, perform the same functions and operate exactly as disclosed by the patent."

This testimony convinces the court, aside from all other evidence, whether it be of experts or otherwise. The evidence with respect to the file wrapper does not disclose anything that would work an estoppel upon plaintiff.

In view of the foregoing, the court must reach the conclusion that plaintiff's patent is valid and infringed. Accordingly, plaintiff is entitled to an injunction against future infringement and a decree for an accounting of profits.

The parties will prepare and submit a decree accordingly.