**REYNOLDS et al. v. WHITIN MACH. WORKS.**

No. 5697.

Circuit Court of Appeals, Fourth Circuit.

March 10, 1948.

Writ of Certiorari Denied June 14, 1948.

See 68 S.Ct. 1513.

Hunter M. Jones and Frank H. Kennedy, both of Charlotte, N. C. (John M. Robinson, of Charlotte, N. C. and E. O. Ayscue, of Monroe, N. C. and Russell M. Robinson, of Greensboro, N. C., on the brief), for appellants and cross-appellees.

William H. Holderness, of Greensboro, N. C., and Newton A. Burgess, of New York City (L. P. McLendon, of Greensboro, N. C., and Reginald Hicks, of New York City, on the brief), for appellee and cross-appellant.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a suit instituted by W. G. Reynolds and others against the Whitin Machine Works involving Reynolds patent No. 2,238,659, covering an improved process of cotton roving and an improved cotton roving frame. Damages were asked for infringement of the patent and also on the ground that defendant in violation of the rights of the plaintiffs had appropriated and used confidential information which plaintiff Reynolds had imparted to one Banfield, who after acquiring the information had been employed by defendant. The District Judge held the patent valid and infringed and found in addition that defendant had improperly acquired and made use of confidential information as plaintiffs contended. He

held, however, that, for the latter wrong, the North Carolina statute of limitations barred recovery of damages accruing more than three years prior to suit; and the practical effect of this holding was to restrict the recovery to profits and damages on account of the infringement of the patent, since the measure of recovery for this was the same as under the other cause of action and the alleged infringement covered the full three year period not barred by the statute. Defendant has appealed from the judgment holding the patent valid. and infringed, and plaintiffs have appealed from the holding that the three year statute of limitation is applicable to the common law cause of action. We think that with respect to all these matters the judgment appealed from was correct. In the view that we take of the case, three matters require consideration: (1) the validity of the patent, (2) the question of infringement, and (3) the statute of limitations.

So far as questions concerning the validity and infringement of the patent are concerned, this appeal involves little more than a rehashing of the matters decided by us in Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587, 590. In that case Saco-Lowell, being a licensee, was precluded from questioning the validity of the patent; but resort was had to the prior art in an attempt to limit the coverage of the patent, with the result that its validity, except as related to the language of the claims, was necessarily passed on in considering the extent of its coverage. Nothing adduced in this case has caused us to doubt the correctness of the conclusions there reached, which are determinative on the questions of validity and infringement here involved. The facts necessary to an understanding of the patent were set forth in our opinion there, from which we quote as follows:

"The invention of Reynolds relates to what is known as the 'roving' of cotton fibre in preparation for spinning into cotton yarn. The roving process consists in taking a strand of cotton fibres called a 'sliver' and submitting it to pulling or 'drafting', as a result of which the sliver is lengthened and attenuated and the fibres of cotton are drawn parallel to each other. Drafting is accomplished by passing the sliver between two pairs of rolls in succession, the second pair operating at a greater rate of speed than the first. The ordinary roving process prior to the invention of Reynolds required three or more distinct drafts; and it was necessary to reform the sliver between drafts by twisting it on a bobbin, so that as many roving frames were required as there were drafts of the sliver.

"Reynolds conceived the idea of performing a series of drafts upon a single machine by reforming the sliver without twisting between drafts. He devised a machine, covered by patent No. 1,738,796, which was to reform the sliver between drafts by a folding process accomplished by the use of rollers having a tongue and groove engagement. These tongue and groove rollers not only reformed the sliver by folding after the first draft but also held it against a second draft made by the succeeding pair of rollers which operated at a greater rate of speed than they. The machine of this first patent was not satisfactory, however, and Reynolds improved it by providing that the folding rollers with the tongue and groove should be on a plane slightly lower than the rollers effecting the preceding draft and should be operated at a slightly advanced rate of speed so as to take up any slackness in the sliver due to the folding operation. The effect of the lowering of the tongue and groove rollers was to hold the sliver in tension, first against the surface of the rollers from which it was coming and then against the surface of the groove of the folding roller into which it was entering. The machine with these improvements worked satisfactorily. It embodied three concepts: (1) Reforming the sliver between drafts by a folding process, (2) holding the fibres from vertical and transverse expansion between the drafts by causing the sliver to travel under tension against surfaces, and (3) using a difference in speed, or take up, to eliminate fullness due to folding.

"After Reynolds had built a machine of the improved character heretofore described and had placed it in success.al op-

eration, the defendant,[1] one of the leading manufacturers of textile machinery in the United States, approached him and proposed that he license the manufacture of the machine by defendant and that he himself enter the service of defendant and work toward perfecting the machine for commercial production. Reynolds agreed to this and spent goodly portions of the years 1933 and 1934 working in defendant's plant with other employees of defendant's experimental department. During this period patent attorneys for defendant cooperated with patent attorneys for plaintiffs in making application for a patent on the improved machine. Application for the patent was filed in July 1934 and the patent, No. 2,238,659, was issued in April 1941.

\* \* \* \* \* \*

"The machine and process of the Reynolds patent undoubtedly marked a great step forward in the art. As said in the opinion of the court below, it 'revolutionized roving in textile plants and became a pronounced commercial success. Six men with this patented device could do the work generally requiring eighteen; one machine did the work of two, sometimes three.' It was hailed by defendant in its advertising bulletins as being revolutionary in character, the following significant statement with regard thereto appearing in its bulletin of October 1934: 'From the first we had realized that this new drafting mechanism is a radical departure from conventional ideas of roving machinery and in the matter of doublings it is a wide-open break with tradition \* \* \*. The facts, as developed in actual mill use, regarding the performance, economy and simplicity of the machine square in every respect with the specifications we had set up as our practical ideal. It provides a unique, simple and effective method of eliminating unnecessary roving operations, and for most organizations makes possible the production of roving for the spinning frames of the required quality and size by a continuous controlled draft, in a single operation.' There was immediate and widespread demand for the machine; and as above stated, royalties of more than $100,000 were paid to plaintiffs, most of these from orders received prior to 1937.

"In May 1934, while Reynolds was still working on the machine of his invention with the draftsmen and engineers of defendant, he conceived the idea that the folding device of the machine might be made stationary and communicated this idea to the employees of defendant with whom he was working and caused it to be inserted in the specification of the patent for which application was made. His thought at first was that a stationary grooved folding block could be substituted for the grooved roll, and a successful experiment in which such folding block was used in connection with the tongued roll was made in defendant's experimental department. He discussed with one of defendant's engineers with whom he was working the advisability of using the folding block without the tongued roll engaging it, but with an ordinary pair of rollers so placed as to engage the sliver immediately after it passed through the folding block. In 1937, after Reynolds had left defendant's service, defendant secured through Jones, one of its engineers, a patent on a machine of this character and began manufacturing it without notice of any sort to plaintiffs. On seeing it, plaintiffs asked in their patent application, which was still pending, that they be allowed claims broad enough to cover the process and mechanism involved. An interference proceeding was initiated by the Patent Office and priority on the four claims involved in this proceeding was awarded plaintiff, although three of the claims were subsequently disallowed. Three additional claims were then filed and allowed, and these, as we shall point out hereafter, fully cover the J frames of defendant's manufacture."

To this we add that, at the time of seeing the Saco-Lowell frames which infringed their patent, plaintiffs saw also the infringing frames of Whitin Machine Works, the defendant here; that the patent under which Whitin claimed to have made them was before the Patent Office in the inter-

---

[1] The word defendant, as used in this quotation, has reference, of course, to Saco-Lowell.

ference proceeding; that the broadened claims subsequently allowed were drawn for the purpose of covering machines of the character manufactured by Whitin as well as those of Saco-Lowell; and that, as we shall point out hereafter, they do fully cover those machines.

In this case, as in that of Saco-Lowell, we are confronted with the fact that the infringing machines were not independently developed but were manifestly the utilization of knowledge and ideas obtained from plaintiff Reynolds through a confidential relationship by Banfield, who was employed first by Saco-Lowell and then by Whitin. In the passage above quoted from the Saco-Lowell opinion, we pointed out how Saco-Lowell secured a patent on a machine embodying the stationary grooved folding block, which Reynolds had suggested while employed by Saco-Lowell as a substitute for the grooved roll of his patent, and which was held by us and by the lower court to be a mechanical equivalent. It appears in this case that Banfield, the man who had examined Reynolds' machine before his employment by Saco-Lowell and had caused him to be employed by that company in 1933 for the purpose of developing and perfecting the machine, left its service in 1935 and became works manager of Whitin. Almost immediately, he was conferring with employees of the latter company with regard to developing the sort of machine on which Reynolds was working; and in a very short while these employees were claiming to have invented the infringing machine of Whitin, for which patent was subsequently applied and which embodies the principle of Reynolds' invention, substituting a skew plate for the grooved roll of the patent or the stationary folding block of the Saco-Lowell J frames, but doing the same thing in the same way by the use of an obvious equivalent. The trial judge found "that F. E. Banfield disclosed to Whitin Machine Works, and also, as its works manager, used for its benefit, the information which Reynolds had disclosed to him in confidence with respect to the Reynolds invention." While there is no direct evidence supporting this finding, it is amply supported by the circumstances in evidence. As said by the trial judge: "Why did Banfield switch jobs in July 1935 by leaving Saco-Lowell and assuming the same job as works manager of defendant? On this the evidence is very meager. The negotiations seem to have originated by James Truslow two or three months before that. Mr. Truslow was head of defendant's long draft room. He informed Mr. Swift that Banfield was available. Swift interviewed Banfield in Boston, no correspondence was employed; and Banfield accepts the job, assuming his duties July 1, 1935. In September following, Brandt and Schlums claim to have invented defendant's device—stationary block —just pulling it out of the 'blue'. Plaintiff took Banfield's deposition. His knowledge of the Reynolds concepts seemed to have disappeared as quickly as Reynolds' folding block of May, 1934. It is unbelievable that he who had such intimate knowledge of Reynolds' system and the daily reports from their experimental department brought none of that knowledge to defendant and Brandt and Schlums just stumbled on the idea. According to Schlums everybody was looking for cheaper devices than defendant's twister head and get something that would possibly work better. The engineering department and the experimental department had been working on the problem from the time Schlums began work there December 1, 1934. Schlums talked with Swift about it in 1935 and he told him to go keep on with it. He admits talking to Banfield about every other problem except this."

There is no evidence from which we can say that Saco-Lowell and Whitin were cooperating in the development of a machine which would avoid the payment of royalties to plaintiff; but there is abundant evidence that they were cooperating in an effort to have the Patent Office hold invalid the Reynolds patent under which Saco-Lowell was licensed. The most favorable interpretation that can be placed upon their conduct in this connection, is that they were using ideas gained from Reynolds in an attempt to manufacture a machine which would utilize the substance of his invention while technically avoiding infringement. We think that they succeeded in utilizing the substance of the invention but failed to avoid infringement.

## Validity

■■ The claims of the patent here involved are claims 15, 22, 25, 27 and 28, which are as follows: "15. The process of drawing fibrous material arranged in strand form which includes giving the strand a substantially uniform thickness throughout its width before drawing, then drawing the strand and thereafter restoring the strand to uniform thickness throughout its width, and holding the strand from vertical and transverse expansion throughout substantially the entire portion of its length following the said drawing and preceding the said restoration of uniform thickness."

"22. The method of cotton spinning consisting in the successive steps of drawing a strand of fibrous material, relieving it from all appreciable draft throughout a substantial length, holding it from transverse and vertical expansion throughout this length, condensing and folding it at the end of this length, and thereafter subjecting it to a further draft, in one continuous process."

"25. Mechanism for drafting fibrous material in strand form having in combination means for drawing the strand, pairs of driven opposed rolls propelling the strand, means acting on the strand intermediate its extent from the nip of one of such pairs to the nip of the next succeeding pair thereof to fold the strand longitudinally inward upon itself so that the fibers which lie at the lateral margins of the strand as the latter passes the first of such pairs of rolls are continuously shifted to occupy a position intermediate the width of the strand as the latter passes the succeeding pair of rolls, the latter pair of rolls propelling the strand at a faster rate than the first of such pairs to take up the slack in certain portions of the cross-section of the strand incident to folding but without effecting any material draft of the entire width of the strand."

"27. Mechanism for drafting fibrous material in strand form including pairs of opposed rolls propelling and elongating the strand, stationary means located between pairs of such rolls engaging the lateral sides of the strand and diverting them inward toward the median line of the strand, and means pressing the strand in a vertical direction cooperating with the stationary means to cause the fibers comprising such lateral sides to be shifted inwardly past the fibers forming intermediate portions of the strand and to assume a position nearer the median line than such latter fibers and to maintain such position as they pass between a following pair of propelling rolls.

"28. Mechanism for drafting fibrous material in strand form including pairs of opposed rolls propelling and elongating the strand, stationary means engaging the lateral sides of the strand and diverting them inward toward the median line of the strand, and roll means propelling the strand and pressing the strand in a vertical direction cooperating with the stationary means to cause the fibers comprising such lateral sides to be shifted inwardly past the fibers forming intermediate portions of the strand and to assume and maintain after such pressing a position nearer the median line than such latter fibers."

We have no doubt as to the validity of the patent as set forth in these claims. As pointed out above, the process as well as the machine for applying it was new and useful and marked a great step forward in the art. It met with immediate commercial success, and royalties in the amount of more than $100,000 were paid plaintiffs by Saco-Lowell under its license. To the presumption of validity attaching to the patent because of its issuance by the Patent Office, is added the additional presumption arising because of the contest incident to the interference proceedings, when the experts of the Patent Office had before them all of the disclosures of the prior art which are urged here and all of the other arguments which are pressed upon us. It is well settled that the action of the Patent Office under such circumstances is entitled to greater weight than where there are no such proceedings. Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S. Ct. 20, 66 L.Ed. 112; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 919, and cases there cited.

Defendant has cited 21 patents as basis for its contention that complainants' invention is lacking in novelty; and this in itself is evidence of the weakness of the contention. Such a citation of so many prior patents almost always means either that

none of them is in point and that the patentee has brought together for the purpose of his invention devices to be found in prior patents of different character, or that there have been prior attempts to solve the problem with which he was confronted which have not met with success. Hoeltke v. C. M. Kemp Mfg. Co., supra; Scott v. Fisher Knitting Mach. Co., 2 Cir., 145 F. 915, 916; Mahony v. Malcom, 7 Cir., 143 F. 124, 125; Forsyth v. Garlock, 1 Cir., 142 F. 461, 463; Mallinckrodt Chemical Works v. E. R. Squibb & Sons, D.C.Mo., 6 F.Supp. 173, 175; York Ice Machinery Corporation v. L. & K. Ice Corporation, D.C.N.Y., 6 F. Supp. 544, 546; Handy v. American Flyer Mfg. Co., D.C.N.Y., 44 F.2d 633, 635; Gillette Safety Razor Co. v. Clark Blade & R. Co., C.C.N.J., 187 F. 149, 152. Patents for useful inventions ought not be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments. In the Saco-Lowell case we went fully into the prior art and further study has convinced us of the correctness of the holding there made where we said: "The prior art particularly relied on consists of mere paper patents which never went into use and which embody none of the features which have made the Reynolds and J. frames successful. These are the DeHemptinne patent of 1865 and the Abbott and Russell patents of 1885. None of these employs folding in the presence of takeup as a means of reforming the sliver and none causes the sliver to travel under tension against surfaces as a means of preventing vertical and transverse expansion. The same is true of the Casablancas patents to which defendant refers. Defendant relies particularly upon the Abbott and Russell patents of 1885 because they show the use of condensing trumpets between drafts of the sliver; and defendant calls its folding block a trumpet. The name, of course, is not important, and we are satisfied that the function of the folding block is very different from that of the Abbott and Russell trumpets. The latter were not designed to cause a folding of the sliver and they were not placed in such way as to cause the sliver to travel under tension against the inside surface of the trumpet, as is the case in the so-called

trumpets of the J frames. If the J model had been designed to embody the principles of Abbott and Russell instead of the Reynolds machine, it would doubtless have failed just as they did."

One prior art patent seriously argued here but not pressed upon us in the former case is the Ashworth British patent, No. 10,992, a mere paper patent more than one hundred years old. It is sufficient to say of this, as we said of the Abbott & Russell patent in our former opinion, that it was not designed to cause a folding of the sliver, nor to cause the sliver to travel under tension against a surface, nor did it do either of these things. If defendant had used the principle of the Ashworth patent instead of the principle employed by Reynolds, he would doubtless have had as little success with it as Ashworth. Another patent relied on here but not in the former case, is the Butler Patent No. 1,433,529, owned by plaintiffs. This was before the Patent Office in the Reynolds application and also in the interference proceeding. It does not provide for folding between drafts, for folding in the presence of takeup, or for folding while the sliver is held under tension against surfaces. It does not appear how it can be said to involve the principle of the patent here in suit.

It is insisted that the patent relied on is invalid in view of the first Reynolds patent No. 1,738,796, which was a failure, but which attempted multiple drafting on a single machine with folding of the sliver by means of rolls with the tongue and groove arrangement. It is clear, however, that the changes made by the second patent spelled the difference between success and failure. The first patent was a failure because of the fullness and expansion of the sliver at the folding stage between drafts. The invention of the second patent was to provide a "takeup" or slight acceleration of the sliver between drafts and thus hold it under tension while at the same time requiring it to engage a surface or surfaces. This was accomplished by placing the draft rollers at different levels so that the sliver would be held against the rollers and providing that at least one of the first set of rollers of the subsequent draft should be rotated a little more rapidly than the rollers

from which the sliver was emerging. This brought success out of failure and undoubtedly constituted patentable invention both as to the process and as to the mechanism for carrying it out. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523. The fact that there was some slight takeup between rolls in the prior art for a different purpose was not material (Id., page 58 of 261 U.S., 43 S.Ct. 322); and in the prior art, there was no such combination of folding in the presence of takeup with requirement that the sliver travel against surfaces under tension.

■ The contention is made that the claims are invalid because they do not distinctly claim the invention as required by R.S. § 4888, 35 U.S.C.A. § 33; but this contention is without merit, as an examination of the claims heretofore quoted amply demonstrates. We think that the claims are sufficiently specific; but, even if this were not true, the court would construe them in the light of the specification and drawings to save a meritorious patent. Black & Decker Mfg. Co. v. Baltimore Truck Service Corp., 4 Cir., 40 F.2d 910. In addition to claims covering the machine of the invention, Reynolds was entitled to the broad process claims covering the process which he had discovered, without reference to specific instrumentalities. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721.

■ The same contention is made here that was made in the Saco-Lowell case that claims 25–28 were filed too late under the decision in Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792, and the answer is the same here as there, viz., that there are no bona fide intervening rights to be protected, "but merely an attempt on the part of defendant to perpetrate a wrong by the appropriation of what in equity, good conscience and common honesty belongs to plaintiffs. * * * Here the patentee gets only that to which he is justly entitled, and the only thing lost by anyone is the unconscionable advantage which defendant seeks to take of plaintiff's confidential disclosure". And here, as in the Saco-Lowell case, even if claims 25 to 28 are disregarded, plaintiff is entitled to relief under claims 15 and 22.

### Infringement

■ Just as Saco-Lowell used the folding block in connection with the bite of the third pair of rolls to perform the function of the tongue and groove in those rolls in reforming the sliver, so Whitin used the skew plate for that purpose. The effect of the tongue and groove was to fold the edges of the sliver towards the center in the form of the letter U; the effect of the skew plate was to fold them towards the center in the form of the letter S. The important matter was the turning in of the selvages before the nip of the third pair of rolls; and the skew plate as well as the folding block involved the use of an obvious mechanical equivalent. The finding of the lower court with respect to the matter, which we approve, is as follows:

"31. The Court finds that the roving frames of the defendant, with the so-called skew plate, of which PX10 is a sample, as commercially installed, consists of mechanical equivalents of the tongue and groove roll frames, known as D models, illustrated in the drawings of the second Reynolds patent as explained by the specifications, including the statement in the specifications that the tongued roll may, in certain instances, be stationary. In the Whitin device, the so-called skew plate, plus the plain rolls of the second and third pairs, perform all the functions of the plain rolls of the second pair illustrated in the drawings of the patent, plus all the functions of the tongue and groove rolls of the third pair, illustrated in the drawings of the patent. The functions peculiar to the Reynolds invention and the parts used to perform said functions in the D models and in the Whitin frame are:

"(a) Folding the strand longitudinally so as to place the margins as they emerge from the second pair of rolls within the width of the strand as it is nipped at the bite of the third pair of rolls. In the tongued and grooved roll arrangement, the strand is prepared for the fold by entering the groove of the grooved roll at its beveled edge and being drawn gradually into the narrow part of the groove where it is formed in a U

shape, the pull of the rolls drawing the margins over and inward. The fold is completed at the nip of the third pair of rolls. In the Whitin arrangement, the function of preparing the strand for the fold is performed by the skew plate serving to turn the strand in an edgewise position so that the edges will contact the arcs of the plain rolls of the third pair in such a manner that they can act upon it in the same way as the side walls of the groove in the grooved roll, turning the margins inward so that when they are nipped at the bite of roll pair three, a fold is completed, and the original margins are placed continuously within the width of the strand.

"(b) Holding the strand from vertical and transverse expansion by causing it to travel against a surface under tension. In the D models this function is performed by wrapping the strand first around a part of the circumference of the bottom roll of the second pair and then around a part of the circumference of the top roll of the third pair, the strand being thus diverted from its natural path, and being given tension by moving the third pair of rolls slightly faster than the second pair. In the Whitin arrangement, this same function is performed by holding the strand under tension against the skew plate, which diverts it from its natural path.

"(c) The use of the take up to eliminate the fullness due to folding. In both the D models and the Whitin frames, this is accomplished by moving the third pair of rolls at a rate of speed sufficiently greater than the speed of the second pair to eliminate this fullness and keep the entire cross section of the strand taut without affecting any material draft of the strand as a whole."

There can be no question that this constituted infringement of the machine claims as well as the process claims of the patent. We think that we need add nothing to what is said on this subject in the opinion in the Saco-Lowell case where there is citation and discussion of the authorities applicable. See 141 F.2d at pages 593 and 594.

### Statute of Limitations

The common law action asserted by plaintiffs is based upon the use by defendants of confidential information imparted by Reynolds to Banfield, the theory of the action being that the unauthorized use of such confidential information by defendant was a violation of plaintiffs' rights. The relief asked was an accounting for the profits and damages resulting from this wrong.

The basis of such an action, as we pointed out in Hoeltke v. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 922, 923, is the principle which forbids unjust enrichment at the expense of another. We said in that case: "The general rule, of course, is that the monopoly of a patent which entitles a patentee to damages for infringement commences only when the patent is granted; but where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another. The question was before the Circuit Court of Appeals of the Seventh Circuit in the recent case of Booth v. Stutz Motor Car Co. of America, 7 Cir., 56 F.2d 962, and we think that the decision there rendered is eminently sound and just. It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the idea of another without liability for the wrong."

Where as the result of such a breach of confidence the guilty party has acquired a patent or other property which in equity and good conscience belongs to another, it is proper to declare a trust with respect thereto and order a conveyance by the person held a constructive trustee to the person entitled to the property. Houghton v. United States, 4 Cir., 23 F.2d 386; Shellmar Products Co. v. Allen-Qualley Co., 7 Cir., 36 F.2d 623; Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303. In this case, however, we are not asked to declare a trust with respect to a patent or other property held by defendant, nor is any property designated to which a declaration of trust

should attach.[2] What we are asked to do is award an accounting of profits and damages resulting from the violation of plaintiffs' rights with respect to the information imparted to Banfield. It is perfectly clear, we think, as held by the trial judge, that recovery for a wrong of this character is barred by the North Carolina three year statute of limitations. Chapter 1 sec. 52 of the General Statutes of North Carolina prescribes that limitation for the following classes of actions:

"4. For taking, detaining, converting or injuring any goods or chattels, including action for their specific recovery.

"5. For criminal conversation, or for any other injury to the person or rights of another, not arising on contract and not hereinafter enumerated. * * *

"9. For relief on the ground of fraud or mistake; the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake."

 The relief asked under the common law cause of action is for injury to the rights of plaintiffs arising through breach of confidence, which is a species of fraud. Maintenance of the action, therefore, is barred by both subsections 5 and 9 above quoted. Plaintiffs contend that only the general statute of limitations, G.S. § 1-56, the ten year statute, applies since they say that this action is one to establish a constructive trust as to which no specific limitation is provided; but, as stated above, the action is not one to establish a trust in property but to recover profits and damages realized from a fraudulent violation of plaintiffs' rights. Declaration of a constructive trust is a form of equitable remedy used for the purpose of reaching property acquired or held wrongfully, not a designation of the wrong which puts it in a special category for the purpose of the statute of limitations.

Even if there were a fund arising from defendant's wrong (which is not alleged)

and it were asked that a trust be declared with respect to it, it is clear under the North Carolina decisions that the three year statute would bar relief. Directly in point is the case of Little v. Bank of Wadesboro, 187 N.C. 1, 121 S.E. 185, 187. That was a suit to establish a constructive trust in land alleged to have been acquired by undue influence. In holding the three year statute applicable, the court said: "Again, it is contended that this is an action to impress a trust upon the property, and in such cases the statute of limitations is the general statute of ten years, as his honor ruled, which time had not elapsed when the suit was instituted. We have held in some cases that the general statute of ten years will apply when the suit is to have one declared trustee for another's benefit and the pertinent facts come directly within the effect and operation of the statute. Sexton v. Farrington et al., 185 N.C. 339, 117 S.E. 172, and authorities cited. But in this case the alleged right to impress a trust upon this property is dependent upon the validity or invalidity of the deed from plaintiff to his brother, Walter, and if the right to assail this deed is barred by the statute, any and all claim to the proceeds in the possession and control of defendants is also barred. For the purposes of this claim, the proceeds from a sale of the property stands in the place of the property itself, and if the one is protected by the statute, the other is also. Sprinkle v. Welborn, 140 N.C. 163, 52 S.E. 666, 3 L.R.A.,N.S., 174, 111 Am.St.Rep. 827. As a matter of fact and by correct interpretation, this is not an action to impress a trust upon property, but one to recover the proceeds of property acquired by fraud and undue influence."

It is perfectly clear that the abuse of confidence relied upon by plaintiffs here is a fraud of the same sort as the undue influence relied on in Little v. Bank of Wadesboro, supra. It involved overreaching and taking of unconscionable advantage; and here, as in that case, the relief sought is, not the impressing of a trust on

---

2 For a trust to be declared there must be specific property as to which the declaration of trust can be made. See Swan v. Children's Home Society of West Virginia, 4 Cir., 67 F. 84; Harmer v. Rendleman, 4 Cir., 64 F.2d 422.

88

property, but the recovery of compensation on account of the wrong perpetrated. In A.L.I. Restatement of Torts vol. 4 p. 4, the basis of such recovery is stated as follows: "There is considerable discussion in judicial opinions as to the basis of liability for the disclosure or use of another's trade secrets. Analogy is sometimes found in the law of 'literary property,' copyright, patents, trademarks and unfair competition. The suggestion that one has a right to exclude others from the use of his trade secret because he has a right of property in the idea has been frequently advanced and rejected. The theory that has prevailed is that the protection is afforded.only by a general duty of good faith and that the liability rests upon breach of this duty; that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret."

While the specific question as to the application of the North Carolina statute of limitations to this particular form of fraudulent invasion of rights has not heretofore arisen, there is no ground of distinction between its application to the fraudulent invasion of rights involved here and that which was before the court in Little v. Bank of Wadesboro, supra. The general rule as to remedies in this class of cases is thus stated in A.L.I. Restatement of Torts vol. 4, p. 10: "One who has a right under the rule stated in this section is entitled to a remedy or remedies appropriate under the circumstances. He may recover damages for past harm, or be granted an injunction against future harm by disclosure or adverse use, or be granted an accounting of the wrong-doer's profits, or have the physical things embodying the secret, such as designs, patterns and so forth, surrendered by the wrong-doer for destruction. Moreover, he may have two or more of these remedies in the same action if the court is competent to administer them. Defenses generally available in tort actions and actions for injunctive relief are also available here, insofar as they are applicable."

There was no error and the judgment appealed from will be affirmed on both appeals.

Affirmed.