**LONG MANUFACTURING COMPANY,**
**Plaintiff,**

**v.**

**LILLISTON IMPLEMENT COMPANY,**
**Defendant.**

**Civ. A. No. 1044.**

United States District Court,
E. D. North Carolina,
Wilson Division.

June 14, 1971.

As Corrected July 13, 1971.

---

A. Yates Dowell, Arlington, Va., Henry C. Bourne, Tarboro, N. C., for plaintiff.

Cyrus F. Lee, Wilson, N. C., Edward Taylor Newton, William J. Ormsby, Jr., Newton, Hopkins & Ormsby, Atlanta, Ga., for defendant.

### MEMORANDUM

WALTER E. HOFFMAN, District Judge.

The plaintiff, Long Manufacturing Company, a corporation of the State of North Carolina, having its principal offices in Tarboro, North Carolina, has brought this action against the defendant, Lilliston Implement Company (now by change of name Lilliston Corporation), a corporation of the State of Georgia, having its principal offices in Albany, Georgia, and a place of business at Weldon, North Carolina, located within the Eastern District of North Carolina. The plaintiff alleges that the defendant has infringed claims one through four of patent number 2,974,467, issued March 14, 1961, to W. R. Long, and all eight claims of patent number 3,007,475, issued November 7, 1961, to W. R. Long. In defense to these allegations, the defendant asserts that (1) all the claims involved are invalid because of lack of invention over the prior art; (2) all the claims involved are invalid by reason of being vague, indefinite and incomplete; (3) defective oaths render patent number 2,974,467 null and void and therefore patent number 3,007,475 is invalid because of public use; (4) the claims of patent number 3,007,475 are invalid because in the specifications and drawings of that patent the inventor did not disclose the best mode contemplated by him in carrying out the alleged invention; and (5) even assuming the validity of the patents in question, there has not been any infringement because of material structural differences and in light of the doctrine of file wrapper estoppel.

Both of the patents in question relate to a peanut combine and stem from a single application which was directed to the overall combine. The Patent Office, however, required division on the ground that the pickup and threshing portions, or front end of the combine, should be separately patented from the cleaning, separating, and collecting portions or back end of the combine. The initial application filed June 12, 1958, finally matured into patent number 2,974,467 and was entitled, "Pickup and Threshing Unit for Peanut Combine."[1]

The second application was filed March 2, 1960. This application subsequently became patent number 3,007,475 and was entitled, "Peanut Combine."[2] Both patents were duly assigned by W.

---

1. Plaintiff's exhibit No. 1.

2. Plaintiff's exhibit No. 2.

R. Long to the plaintiff, Long Manufacturing Company.[3]

## HISTORY OF DEVELOPMENT OF THE PEANUT COMBINE

Peanuts, which grow underground attached to vines extending above the ground, are harvested by being plowed up and subsequently removed from the vines. Prior to the combine, the plowed-up vines with the peanuts attached were stacked around poles for a period of two to six weeks to permit drying of the vines and peanuts before picking. The stacking, which kept most of the peanuts off the ground and thereby prevented rotting in the rainy weather, was done by hand, as was the tedious task of picking.

At least as early as 1913, machines were employed to pick the peanuts from the vines and remove the stems from the peanuts.[4] The earliest peanut pickers were operated while in a stationary position either working around the poles or by having the stacks of vines brought to the machine. These machines, which operated in a stationary position, were generally of two types: (1) the carding-type machine whereby the peanut vines would be placed on a long chain conveyor which would draw the vines through a series of fixed spring fingers which, in turn, would comb the peanuts from the vines;[5] and (2) the cylinder-type machine whereby the peanut vines placed in the machine would be drawn through the machine by the fingers, which were attached to the outer rim of the cylinders, drawing the vines along as the cylinders rotated. At the same time spring fingers extending upwardly from arcuate breastplates beneath each cylinder would comb the peanuts from the vines as the vines passed between the breastplate and cylinders.[6]

Although the stationary pickers substantially reduced the labor involved in the harvesting process, they still required about twelve men for operation. Around 1945, the idea developed that labor could further be reduced by producing a combine which would move through the fields and harvest the peanut vines, which would previously be plowed up and placed in windrows, rather than operating the machines in a stationary position. In addition to saving labor, another attractive feature about this method of harvesting is that the peanut vines could be harvested only a short period of time after having been dug up, since they would dry more quickly in the windrows than while piled up around stakes. Accordingly, the hazard of rain damage to the exposed peanuts would be reduced. Pursuant to these ideas and advantages, many machines were developed and patented, among which are the combines involved in this litigation.

W. R. Long, the president of the plaintiff company started working on the patented combine in 1956 and, by 1957, had built his first prototype. Like the Lilliston machine which was developed around 1964, Long's combine is designed to pick up the vines and through a process of threshing cylinders and cleaning and separating devices to efficiently harvest the peanuts.

## BURDEN OF PROOF

■ At the outset, we note that, under 35 U.S.C., section 282, a presumption of validity attaches to a patent when it is granted by the Patent

3. Plaintiff's exhibit No. 12. See also plaintiff's exhibit No. 1 and defendant's exhibit No. 18 (front page and page 74).

4. Patent number 1,081,593 issued to H. W. Eisenhart and M. W. Darden (defendant's exhibit No. 53).

5. Examples of this type machine are the Eisenhart, et al. patent (defendant's exhibit No. 53); Morris patent (defendant's exhibit No. 59); and the old Lilliston patent (defendant's exhibit No. 56).

6. Examples of this type of machine are the Livermon patent (defendant's exhibit No. 52); the Ronning patent (defendant's exhibit No. 54); and the two Good patents (defendant's exhibits Nos. 50 and 51).

Office.[7] This apparently stems from the expertise credited to patent examiners in these matters. It is clear, however, that this presumption is not conclusive. It may be rebutted by clear and convincing evidence [8] and may be overcome when pertinent prior art was not before the Patent Office during its consideration of the application.[9] This is important to note at this point because, as will be shown in the text of this opinion, the defendant heavily relies on several combines [10] as references for invalidating the plaintiff's patents (particularly the Frick machine) which were not cited and apparently were not before the Patent Office during the application process.

### PATENT NUMBER 2,974,467

As previously noted, patent number 2,974,467 relates to the front end or the pickup and threshing part of the peanut combine. More specifically, it involves a rotary pickup which, rotating in a clockwise direction, picks up the vines of peanuts after they have been plowed up and gathered in windrows in the field and are sufficiently dry for harvesting. The vines which are picked up by the reel are then put into contact with a large threshing cylinder with spring fingers which is rotating in a counterclockwise direction, thereby carrying the vines higher and to the rear of the combine to a transfer cylinder. The transfer (or stripper cylinder), also with spring fingers, rotates in a counterclockwise direction and carries the vines higher and to the rear to another threshing cylinder. The second threshing cylinder also has spring fingers and also rotates in a counterclockwise direction carrying the vines, which are by this time stripped of peanuts, toward the rear of the combine and out the exhaust. Underneath each of the two threshing cylinders are arcuate perforated breastplates with fingers extending upward which, coacting with the fingers of the threshing cylinder and the rotating motion, perform the threshing function. The only difference between the two arcuate perforated breastplates is that only the second one (the breastplate under the smaller of the two threshing cylinders) has holes large enough to permit peanuts to fall through to a pan below. Underneath the transfer cylinder is a flat imperforate plate which connects the two aforementioned arcuate perforated breastplates.

The plaintiff alleges that of the five claims in the patent, claims one through four have been infringed. These claims are as follows: [11]

"1. In a peanut combine relatively large threshing cylinder means having spring fingers for engaging the peanut vines, a pickup slightly ahead of and below said threshing cylinder means, said pickup being located near the earth and having fingers for engaging the peanut vines and for conveying them into contact with said threshing cylinder means, a breastplate located rearwardly of said pickup and beneath and in operative relation to said threshing cylinder means, said breastplate having openings therein and a series of spring fingers extending through said openings upwardly into the path of movement of

7. Keiser v. High Point Hardware Co., 311 F.2d 850 (4 Cir., 1962); Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855 (4 Cir., 1956), cert. denied, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956), rehearing denied, 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120 (1956).

8. Neff Instr. Corp. v. Cohu Electronics, Inc., 298 F.2d 82 (9 Cir., 1961).

9. A R Inc. v. Electro-Voice, Inc., 311 F.2d 508 (7 Cir., 1962); Jaybee Mfg. Corp. v. Ajax Hardware Mfg. Corp., 287 F.2d 228 (9 Cir., 1961); Gillette Safety Razor Co. v. Cliff Weil Cigar Co., 107 F.2d 105 (4 Cir., 1939).

10. These include the Frick combine (defendant's exhibit No. 49 and exhibit No. 82); the Livermon combine (defendant's exhibit No. 108); Case combine (defendant's exhibit No. 21 and No. 36); and the Boesch patent (defendant's exhibit No. 60).

11. See plaintiff's exhibit No. 1 and defendant's exhibit No. 72 and No. 73.

the vines and operating in conjunction with the spring fingers on said threshing cylinder means for detaching the peanuts from the vines, the size elevation and relational arrangement of the pickup and the threshing cylinder means permitting the combine to be made of relatively low overall height.

"2. The structure of claim 1 in which said threshing cylinder means comprises spaced multiple threshing cylinders one rearwardly and slightly higher than the other.

"3. The structure of claim 1 in which said threshing cylinder means comprises spaced threshing cylinders and said breastplate includes perforated arcuate portions one beneath each of said threshing cylinders with an imperforate portion therebetween and with the openings beneath the rearmost threshing cylinder being of a size to permit the peanuts to fall therethrough.

"4. The structure of claim 1 in which said pickup is of the reel type and with spring fingers for engaging the peanut vines."

An analysis of the above claims reveals that the most significant features of the front end of the combine are: (1) a reel type of pickup located near the earth which has fingers for engaging the peanut vines; (2) a large threshing cylinder which has spring fingers for engaging the vines; (3) a second threshing cylinder located rearwardly and slightly higher than the first cylinder; (4) arcuate perforated breastplates beneath each cylinder with spring fingers extending upwardly which, operating in conjunction with the spring fingers of the cylinders, detach the peanuts from the vines; and (5) the openings in the rearmost perforated arcuate breast-

plates being large enough to permit peanuts to fall through to the stepped pan below. With these particular features in mind, the first question we must resolve is whether those features individually or as a combination are anticipated by the prior art so as to render the patent invalid in light of 35 U.S.C., section 103.

## PRIOR ART

Title 35 U.S.C., section 103, states:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The recent case of Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) established the test to be applied for cases arising under 35 U.S.C., section 103.[12] In *Graham*, Mr. Justice Clark said:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."[13]

Applying the *Graham* test to the case at hand, it is clear that all the working parts of the outstanding features of Patent Number 2,974,467 appear in pre-

12. In a long and complete discussion of the requirements of patentability, the Supreme Court noted that, in addition to the long-recognized requirement of novelty and utility, Congress, in enacting section 103 in 1952, added a third statutory test of nonobviousness which must be met to establish a valid patent. Graham v. John Deere Co., 383 U.S. 1, 3, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

13. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

vious patents and combines, which must be considered part of the prior art.[14] The reel type of pickup which is located near the ground and which has fingers for engaging the peanut vines is clearly shown in the Frick,[15] Krause,[16] Livermon,[17] Case,[18] and McElhoe [19] combines. A threshing cylinder located upwardly and rearwardly from the pickup appears in the Frick, Krause, Livermon, Ronning,[20] Landrum,[21] and two Good [22] combines. In the Frick and Good combines, and possibly even the Livermon and Ronning patents, the first threshing cylinder is "relatively large." [23] In virtually all of the above-cited prior art combines, the cylinders have spring fingers; there are arcuate perforated breastplates beneath each cylinder; spring fingers extend upwardly from each breastplate and coact with the fingers on the cylinders to thresh the peanuts from the vines as they pass between the cylinders and the breastplates; and the breastplates or portions thereof which are above the pan, which receives the threshed peanuts, have holes large enough for a peanut to pass therethrough. Like the Long combine, the Livermon patent has a series of two cylinders whereby the rearward one is a little higher than the first. It should also be noted that the configuration of the two cylinders with a transfer cylinder between found in the Livermon patent, along with arcuate and perforated breastplates under each of the threshing cylinders and an imperforate plate which attaches the two arcuate perforated breastplates, is almost identical to the pattern used by Long.[24]

This examination of the prior art as compared with each element of the patent in question compels the conclusion that each element was obvious to one of ordinary skill in the art, and therefore would not be patentable separately. Even so, a combination of these old elements could be patentable if invention can be found in the combination.[25] The only possible evidence of a new combination in patent number 2,974,467 is the method whereby the peanut vines are fed directly from the rotary pickup to the first threshing cylinder. All previous combines that have employed a rotary

14. 2 Deller's, Walker on Patents, section 107, page 114 (1964).

15. Defendant's exhibits No. 49 and No. 82.

16. Defendant's exhibit No. 55. It should be noted that this is a combine used primarily for havesting grain. This was, however, one of the patents cited by the Patent Office in granting Long's patent (see plaintiff's exhibit No. 1), and therefore may be considered significant for its revealing structure of combines in general.

17. Defendant's exhibit No. 108.

18. Defendant's exhibit No. 30.

19. Defendant's exhibit No. 124.

20. Defendant's exhibit No. 54. Like Krause, this is primarily a grain combine and was also cited by the Patent Office in granting Long's patent (see plaintiff's exhibit No. 1).

21. Defendant's exhibit No. 118.

22. Defendant's exhibits No. 50, 51 and 89.

23. At this point, the term "relatively" is used to show the relation of this cylinder to both the entire combine and the other cylinders. This term will be discussed at greater length later in the opinion in the context of whether the plaintiff, by its use, has clearly defined his claim.

24. Compare defendant's exhibit No. 52 (figure 2) (also seen in defendant's exhibit No. 88) with plaintiff's exhibit No. 1 (figure 1) (also seen in plaintiff's exhibit No. 2–A).

25. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177 (1881); Heyl & Patterson, Inc. v. McDowell Co., Inc., 317 F.2d 719 (4 Cir., 1963); Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 40 F.2d 910 (4 Cir., 1930).
It is significant to note that even the plaintiff's expert, Nolan, testified that all of the elements, with the possible exception of a finger-type pickup, were old in the art of peanut combines. Nolan's primary contention, however, was that it was a new combination of these elements which made the patent valid. (T.R. pp. 284–286)

274

type pickup have had either a conveyor or auger feeder of some type between the rotary pickup and the first threshing cylinder. In essence, therefore, the question is whether the fact that Long has eliminated the conveyor and brought the first threshing cylinder to a lower height in the machine so that the vines picked up by the rotary pickup are directly conveyed to the threshing cylinder is an invention so as to validate the patent.

The leading case on the question of whether the combination of old elements into a new device constitutes an invention is Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). In that case the patentee asserted invention of a cashier's counter equipped with a three-sided frame which would move the groceries placed on the counter. In discussing the test of inventiveness from old elements combined, Mr. Justice Jackson said (p. 152, 71 S.Ct. p. 130):

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics."

In holding that the counter in question did not constitute an invention, the Court noted:

"This counter does what a store counter always has done—it supports merchandise at a convenient height while the customer makes his purchases and the merchant his sales. The three-sided rack will draw or push goods put within it from one place to another— just what any such rack would do on any smooth surface—and the guide rails keep it from falling or sliding off from the counter, as guide rails have ever done. Two and two have been added together, and they still make only four."

The Court then added its advice to other courts faced with the same problem, where it said (pp. 152–153, 71 S.Ct. p. 130):

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

■ An analysis of the facts of our case in light of the law of *A & P* as applied to the facts of that case leads us to conclude that the combination of old elements in Long's patent number 2,974,467 does not constitute an invention, and therefore the Court finds the patent invalid under 35 U.S.C., section 103. As previously noted, every essential feature of patent number 2,974,467 is included at least once in the prior art, and some virtually span all the knowledge gathered on peanut combines over the first half of the twentieth century. In addition, the functions of the elements in Long's combine are the same as the functions they have performed in other combines. The reel type pickup conveys the vines initially into the machine as the reel type pickup does in Frick, Krause, Livermon and Case. The large threshing cylinder, arcuate and perforated breastplates, spring fingers extending from both the cylinders and breastplates, and the openings in the breastplates large enough to permit peanuts to fall through to a pan below, all do the same things in the same way that almost every cylinder type combine known before has done. In fact, the only thing that is at all different in the front end

of Long's combine is the arrangement whereby the conveyor is eliminated and the first threshing cylinder is lowered. Even recognizing, as the plaintiff suggests, that the advantages of such an order are to reduce the overall height of the combine and prevent the vines from getting clogged at the point of transfer to the first threshing cylinder,[26] it cannot be concluded that this arrangement produces a new result either as related to the entire combine or to the working of the individual parts. While the patentee should be commended for his success in arranging these old elements into a mechanically functional and most desirable combine, the new arrangement is only evidence of mechanical skill and falls short of the test of inventiveness.[27]

The principle of mechanical skill not amounting to invention was well-stated in Hutchinson Mfg. Co. v. Mayrath, 192 F.2d 110 (10 Cir., 1951), cert. denied 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1329 (1952). That case is particularly applicable to the case at hand since all of the elements in each of the claims of the patent in question were disclosed in prior patents, although no single prior patent or disclosure showed all of the elements in a single device. After finding that each of the elements in the combination patent performed the same functions as they had in previous patents and that together they produced "no result other than the aggregate results of such functions," the Court held that the combination patent did not meet the *A & P* test whereby "the whole in some way must exceed the sum of its parts." The Court then went on to say:

"And where a patentee brings together old elements in a mechanism, involving no new principle, to produce an old result, although he produces a machine that is more efficient and hence more useful in the art, it is still the product of mechanical skill and not of invention." [28]

## INDEFINITENESS OF THE CLAIMS

In addition to the contention that patent number 2,974,467 is invalid in view of the prior art, the defendant argues that it is also invalid by reason of being vague, indefinite, and incomplete and does not, therefore, meet the standard set forth in 35 U.S.C., section 112. Title 35 U.S.C., section 112 states in part:

"The specification shall contain a written description of the invention * * * in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

26. This was found to be a particular problem in the development of the Turner combine. See T.R. pp. 157–159 and 879–881.

27. Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 55 S. Ct. 455, 79 L.Ed. 1005 (1935).

28. Hutchinson Mfg. Co. v. Mayrath, 192 F. 2d 110, 113 (10 Cir., 1951), cert. denied, 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1329 (1952). This principle was also adopted by the United States Court of Appeals for the Fourth Circuit in Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 192 F.2d 270 (4 Cir., 1951), cert. denied, 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1330 (1952). See also, B. F. Goodrich Co. v. United States Rubber Co., 147 F.Supp. 40 (D. Md., 1956), aff'd 244 F.2d 468 (4 Cir., 1957). It is interesting to note that, as the Supreme Court indicated in *A & P*, a combination of old elements in the fields of chemistry or electronics may well take on some new quality or function and result in patentability. See for example United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1965), where a combination of old elements dealing with the interaction of metals and chemicals in a battery was held to be patentable, and Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir., 1961), where a combination of old elements dealing with tap-off couplers for coaxial transmission lines used for supplying impulses to individual television sets was also held to be patentable. The Supreme Court went on to say in *A & P*, however, that such was not the "usual result" when combining old elements in the field of mechanics.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

The defendant contends that the terms "relatively large" when describing the first threshing cylinder and "relatively low" when describing the overall height of the combine are not so exact as to enable one skilled in the art to make use of them. These terms are both mentioned in claim number one. Claims number two, three and four are all dependent upon claim number one, and therefore, if the terms are so indefinite as not to sufficiently describe the structure to one of ordinary skill in the art, all four claims must be invalidated.

The immediate question that arises as to the term "relatively" is, "relative to what?"[29] Stated otherwise, what is the basis of comparison which makes the first threshing cylinder "relatively large" and the overall height "relatively low?" An examination of the drawing included in the patent[30] reveals that the first threshing cylinder is indeed large as compared to either the transfer cylinder or the second threshing cylinder. It is also large as compared to the entire machine as its diameter appears to be about one-half of the height of the combine. Furthermore, it is large as compared to the threshing section as it appears to encompass about one-third of the volume. In addition to these possibilities,[31] which all deal with size, still another was suggested by the plaintiff's expert, Nolan, who said he thought "the term 'relatively large' meant threshing capacity as much as diameter size".[32] Nolan admitted on cross-exami-

nation, however, that there was no basis given in the patent for defining the term.[33]

The claim that the combine is of a "relatively low" overall height is yet more elusive, for there is no basis of comparison one can derive by looking at this combine alone. As compared with other combines, Long's may be lower in height, but where as here no measurements are given, even this cannot be ascertained.

Courts have often looked with disfavor on terms such as "relatively," especially where, as here, it is used to describe what the plaintiff contends are key parts to the patent.[34] In applying the same theory to our case, it is important to remember that the plaintiff here relies heavily on the contention that the structure of his combine is something new and therefore patentable. He also contends that two of the main features of this structure are the large threshing cylinder and the low overall height of the combine. No dimensions or bases for comparison can be found in the claims and description of the patent, however, and the various possibilities suggested by the term "relatively" only lead to confusion.

■ In holding claims one through four of patent number 2,974,467 invalid for indefiniteness, the Court finds this is wholly consistent with the purpose behind 35 U.S.C., section 112. Simply stated, that statute requires the clear definition of the claims of a patent so that one engaging in the same art will not run the risk of infringement during the tenure of the patentee's monopoly, to the end that, when the patent expires, the

29. B. F. Goodrich Co. v. United States Rubber Co., 147 F.Supp. 40, 75 (D.Md., 1956).

30. Plaintiff's exhibit Nos. 1 and 2–A. The Court recognizes the principle that the claims should be read in light of the specifications and drawings. Reynolds v. Whitin Machine Works, 167 F.2d 78 (4 Cir., 1948). Even when this is done, however, confusion still exists as to what the term "relatively" means.

31. T.R. pp. 957–960.

32. T.R. p. 240.

33. T.R. p. 283.

34. Todd v. Sears, Roebuck & Co., 216 F.2d 594 (4 Cir., 1954); B. F. Goodrich Co. v. United States Rubber Co., 147 F.Supp. 40 (D.Md.1956), aff'd, 244 F.2d 468 (4 Cir., 1957).

claims will teach one of ordinary skill in the art how to practice it.[35] As shown herein, the term "relatively" precludes this purpose from being fulfilled.

## DEFECTIVE OATHS

The third defense that Lilliston raises as to patent number 2,974,467, is that the oaths, which Mr. Long made in connection with his patent application, were defective because material changes were made in the application after the oath was signed and before the application was filed. Specifically, the defendant contends that the flat plate, which connects the two arcuate perforated breastplates, was originally also perforated, but in the final patent which was granted it was imperforated. Additionally, the defendant contends that the first application did not contain figures 17 through 20, which do appear in the final patent. On these grounds, the defendant submits that patent number 2,974,467 is invalid for defective oaths and consequently patent number 3,007,475 is invalid for public use. For the reasons stated below, the Court finds these defenses without merit.

██ The evidence presented shows that Long filed two oaths in his application which resulted in patent number 2,974,467. The first oath was executed by Long on March 28, 1958, in Edgecombe County, North Carolina,[36] and the second oath was executed by Long on June 10, 1958, in Washington, D.C.[37] Accompanying the first oath were written and pictorial descriptions of the combine.[38] The written description clearly states that the plate was to be imperforated [39] and the illustration of the flat plate in the initial application is exactly the same as the illustration on the final patent.[40] Based on this, it is clear that there was no change in the description of the flat plate and that it was to be imperforated. Mr. Long, however, testified on cross-examination that he thought the plate was to have holes in it. [41] In resolving this apparent conflict, we elect to adopt the writing and description of the application at the time it was made, rather than the testimony of Mr. Long as to what he thought some twelve years later. However, even if the testimony of Mr. Long were adopted and there was in fact a change in the characteristic of the flat plate, it would not be so significant or material as to render the oath and consequently both patents invalid. For the same reason, the Court discards the contention by the defendant that figures 17 through 20, which appear in the final patent, were not included in the original application, since they primarily show the attachment to the tractor and have no material bearing on the actual working of the combine.

## INFRINGEMENT

The final argument that Lilliston makes with regard to patent number 2,974,467 is that, even assuming the validity of the patent, there has been no infringement. To support this contention, Lilliston submits that there are material structural differences between its combine and Long's and, furthermore, the doctrine of file wrapper estoppel precludes Long from alleging infringement.

The main structural difference that the defendant points to in showing non-infringement is the "auger feeder." [42]

35. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938); Wayne Knitting Mills v. Russell Hosiery Mills, Inc., 400 F.2d 964 (4 Cir., 1968), cert. denied, 393 U.S. 1064, 89 S. Ct. 717, 21 L.Ed.2d 707 (1969); Jones Knitting Corp. v. Morgan, 361 F.2d 451 (3 Cir., 1966).

36. Defendant's exhibit No. 18, p. 25.

37. Defendant's exhibit No. 18, p. 26.

38. Defendant's exhibits Nos. 96 and 97.

39. Defendant's exhibit No. 96, p. 7.

40. Compare plaintiff's exhibit No. 1 (figure 59) with defendant's exhibit No. 97 (figure 59).

41. T.R. p. 133.

42. Plaintiff's exhibit No. 5, figure 2, item B. See also defendant's exhibit No. 149.

This is a cylindrical structure which has spring fingers and which is located above and to the rear of the reel pickup. The defendant states that its primary function is to serve as a transfer system whereby the vines, which are picked up by the reel, are delivered to the three threshing cylinders, each successively higher and to the rear of the auger feeder. The alleged advantage of this system is that it is more efficient than other combines because, being wider at the point of pickup and narrower at the point where the vines are delivered from the auger feeder to the first threshing cylinder, more vines can be gathered into the machine on each run through the field.

The defendant strongly urges that the auger feeder was not intended to, nor does it in fact, act as part of the threshing cylinder means. The plaintiff, on the other hand, alleges that the auger feeder is in reality part of the threshing cylinder means and falls within claim number one of his patent.[43] The question to resolve, therefore, is whether, even assuming Long's patent is valid, the Lilliston combine is the same or substantially the same as Long's so as to conclude that there has been infringement under the doctrine of equivalents.

■ The leading case on the doctrine of equivalents is Graver Tank and Manufacturing Company, Incorporated v. Linde Air Products Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). There, the Supreme Court indicated that for infringement there does not have to be an exact copy of a patent. Rather, infringement can be declared where two machines are substantially the same with particular reference to the type of work, the method of operation, and the result. In establishing what constitutes equivalency the Court stated that

"equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case," and that "a finding of equivalence is a determination of fact."[44]

■ Applying the *Graver* test to the case at hand, the Court concludes that there is a substantial difference between the front ends of the two combines in question and therefore finds no infringement of patent number 2,974,467. The most striking evidence which leads to this conclusion is the difference between the concept claimed by Long, whereby the vines are fed directly from the reel pickup to the first threshing cylinder, and the idea that Lilliston uses in employing an auger feeder. Based on an examination of every other threshing cylinder in a cylinder type combine in the prior art, it cannot be said that Lilliston's auger feeder is a threshing cylinder. The reason for this is that under every other threshing cylinder (including those in the Lilliston and Long combines), there are spring fingers extending upward from the breastplates which coacting with the spring fingers and rotation of the cylinders, perform the threshing function. No such spring fingers can be found under the auger feeder. It is significant to note at this point that even Mr. Long recognized this difference when, upon being asked to examine Lilliston's combine and point out the threshing cylinders, he did not mention the auger feeder. Rather, he noted that there were only three threshing cylinders because these were the only ones with spring fingers extending upwardly from the arcuate breastplates.[45] Of course, it is true, as the plaintiff contends, that some peanuts will fall off as the vines pass through the auger feeder.[46] It does not appear, however, that this is a significant amount. Fur-

---

43. It will be recalled that Long claimed a reel type pickup having spring fingers for engaging the vines and for conveying them into contact with the threshing cylinder means.

44. Graver Tank and Manufacturing Company, Incorporated v. Linde Air Prod-

ucts Company, 339 U.S. 605, 609, 70 S. Ct. 854, 857, 94 L.Ed. 1097 (1950).

45. T.R. pp. 39–40.

46. This was testified to by defendant's witness William D. Kenney, T.R. p. 914.

thermore, it is understandable that some peanuts will fall off the vines at this point when one considers the friction created as the vines pass through this narrow area.

As previously noted, if there is any novelty at all in Long's combine, it is in the concept whereby the vines picked up by the reel are conveyed directly to the first threshing cylinder.[47] In fact, until Long came along, practically every other peanut combine employed a conveyor system or auger feeder of some type to carry the vines from the pickup to the first thresher.[48] A finding of significant difference in the auger feeder, therefore, takes Lilliston's combine away from any claim of infringement as to patent number 2,974,467, for clearly all other elements relating to this patent and which also may be found in Lilliston's combine are prevalent in the prior art and freely available to those who wish to use them.

In addition to finding Lilliston's auger feeder significantly and materially different from Long's as to structure, purpose, and result, the Court notes in passing that Lilliston has no "relatively large" threshing cylinder which Long has claimed as part of his invention. If anything, Lilliston's threshing units are rather small. Since this is only a matter of degree in size, however, the Court declines to find noninfringement solely on that basis.

## FILE WRAPPER ESTOPPEL

■ Hand-in-hand with the doctrine of equivalents, Lilliston submits that the court should also consider the doctrine of file wrapper estoppel to preclude Long from claiming infringement on the front end of the combine.[49] Under the doctrine of file wrapper estoppel, a patentee who has altered or delimited his claims during the patent application process is bound by his limitations, and he cannot thereafter recapture what he has disclaimed against any equivalents.[50]

During the period of time when patent number 2,974,467 was being considered by the Patent Office, the examiner raised the question of how the pickup mechanism shown in figures 13–15 of the patent could be read in light of claim number 21 (now claim five), which is not part of this suit, but which does relate to claim number 17 (now claim one) which is in controversy here.[51] Figures 13–15 show a modification which can be attached to the front end of Long's combine in order to harvest peanuts when the vines are piled up rather than placed in windrows. In this mechanism, a shovel-type structure piles the vines onto a conveyor belt which, in turn, carries them toward a set of fingers rotating in a counterclockwise manner. The rotating fingers then convey the vines into contact with the first threshing cylinder.

In response to the examiner's inquiry, Long said that claim number seventeen (now claim one) is readable upon Figure 13.[52] In other words, Long concluded that the rotating fingers of this mechanism perform the pickup function and,

47. In the file wrapper, Long emphasized this point when he said: "Applicant's combination of elements appears to be novel and patentable, being directed to the intimate association of the pickup and the threshing cylinder with the pickup located near the earth and supplying the peanut vines with the peanuts thereon directly to the threshing cylinder." Defendant's exhibit No. 18, p. 67. See also the testimony of defendant's expert Shefte, T.R. pp. 998–1002.

48. This is readily shown in the Case and Livermon combines where a conveyor is used and in the Frick combine where a combination of a conveyor and feeding cylinder is employed.

49. Exhibit Supply Company v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L. Ed. 736 (1942).

50. American Photocopy Equipment Co. v. Rovico, Inc., 257 F.Supp. 192 (N.D.Ill., 1966), aff'd, 384 F.2d 813 (7 Cir., 1967), cert. denied, 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed.2d 1133 (1968), rehearing denied, 390 U.S. 1037, 88 S.Ct. 1404, 20 L.Ed.2d 298 (1968).

51. Defendant's exhibit No. 18, pp. 63–64.

52. Defendant's exhibit No. 18, pp. 68–69.

therefore, could be read consistently with claim one.[53]

While the Court finds that the rotating fingers do aid in the delivery of the vines directly to the threshing cylinder in this mechanism, it cannot conclude that there is any picking up done by these fingers. Unlike the front end of the combine as used when harvesting the vines in windrows, these fingers rotate counterclockwise and at most convey the vines laterally rather than upwardly. Furthermore, it is clear that if anything acts as a pickup here it is the shovel which lifts the vines onto the conveyor. For these reasons, the Court finds claim number seventeen (now claim one) cannot be read on figures 13–15. Since noninfringement has been found by applying the doctrine of equivalents and without the use of file wrapper estoppel, however, the Court sees no need to pursue this point any further.

## PATENT NUMBER 3,007,475

The back end or the cleaning, separating, and collecting portions of the combine are embodied in patent number 3,007,475. More specifically, this patent involves a stepped pan which receives peanuts falling through the openings in the second arcuate breastplate (under the rear threshing cylinder). Peanuts are also received on this pan as they drop from the vines as the vines move downwardly along the vine rack on their way to being discharged through the exhaust. At the rearward end of the stepped pan is a declining stepped screen, which at its rearward end has a series of tines. The peanuts, which move toward the rear of the machine by an oscillating type motion, undergo their initial cleaning due to the jiggling effect on the peanuts as they are spread over and pass rearwardly on the surface of the pan. As the peanuts pass off the end of the stepped pan and onto the declining stepped screen, they enter a second cleaning phase whereby, due to air from the first blower passing through the steps and the jiggling motion of the combine causing the peanuts to bounce from one step to the next, clods of dirt and other foreign matter are separated from the peanuts. The stepped screen has holes in it through which an object the size of a peanut will fall and move to the collecting point without passing over the tines at the end of the stepped screen or the stemmer saws underneath. Most of the peanuts, however, will be carried down the stepped screen, through the tines, and into the stemmer saws. These little saws will then, as they rotate and cut the vine stems, carry the peanuts to the collecting point. The collecting point herein referred to is a funnel-type structure whereby the peanuts will fall into a pipe. An air stream from a second blower will then move the peanuts up the inclined portion of the pipe and into a position where the air pressure is lowered and the peanuts can be discharged in collecting bags without injury to the collector.

The plaintiff alleges that all eight claims of this patent have been infringed. The claims are as follows:

"1. In a peanut combine having means for elevating peanut vines with peanuts attached and for separating the peanuts from the vines, a housing, vine discharging means for discharging the vines from the rear of said housing, a stepped pan mounted in said housing and adapted to evenly spread the peanuts and move the same toward the rear of the machine, a stepped screen mounted in said housing below the discharge end of said pan for receiving peanuts from said pan, the openings in said screen being of a size to permit the peanuts to fall therethrough, a blower adapted to blow air through said screen to separate pieces of vine, dirt and trash from the peanuts, a connecting member located beneath said housing into which peanuts may fall by gravity, a peanut discharge pipe associated with

---

53. Apparently, the patent examiner was satisfied with this explanation and subsequently the patent was granted.

said connecting member exteriorly of said housing and having a portion inclined upwardly and terminating in multiple discharge openings, a second blower on one end of said discharge pipe and adapted to blow the peanuts up said inclined portion and through said discharge openings, and an air vent at the top of said inclined portion having means for reducing the air pressure so that the peanuts may be collected in bags without injury.

"2. In a peanut combine having means for elevating peanut vines with peanuts attached and for separating the peanuts from the vines, a housing, vine discharging means for discharging the vines from said housing, means adapted to receive the peanuts after they have been separated from the vines and to move the same in the machine, a screen for receiving the peanuts from the end of said peanut moving means, a blower adapted to blow air over said screen to clean said peanuts, a flared member lower than said screen whereby peanuts may fall by gravity from said screen into a discharge pipe in a minimum amount of space, a peanut discharge pipe operatively associated with said flared member having a portion inclined upwardly and terminating in a discharge opening, and means for moving the peanuts through said discharge pipe and through said discharge opening.

"3. The structure of claim 2 in which said last mentioned means comprises a second blower.

"4. The structure of claim 2 in which said screen has a plurality of tines to aid in cleaning said peanuts.

"5. In a peanut combine of low overall height and including means for separating the peanuts from the vines and for causing the peanuts and vines to pass through the machine, the improvement of an inclined screen onto which the peanuts are discharged, said screen having openings of a size through which the peanuts can fall, a blower having a discharge for directing air against said screen for separating foreign matter from the peanuts, a discharge pipe having one end open to receive peanuts from said screen, a conveyor tube connected to said discharge pipe and extending upwardly at an angle and with a depending discharge extremity, said tube being provided with air venting means at its upper portion for the discharge of foreign matter and the release of air pressure whereby peanuts will be subjected to reduced air pressure upon their discharge.

"6. The structure of claim 5 in which said discharge extremity has multiple discharge openings, and valve means for selectively directing the discharge through said openings.

"7. In a peanut combine a downwardly inclined screen on which the peanuts are adapted to be received, said screen having openings of a size to allow the peanuts to fall therethrough, a blower for producing flow of air over said screen for removing foreign matter from the peanuts, a generally horizontally disposed discharge pipe located below said screen and extending laterally therefrom, a connection providing an inlet into one end portion of said discharge pipe through which peanuts falling through said screen are received, a conveyor tube connected to the other end portion of said discharge pipe, said conveyor tube extending upwardly at an angle and having a curved end portion terminating in a depending discharge extremity, and air venting means in the upper portion of said conveyor tube for the discharge of foreign matter and the release of air pressure whereby the peanuts will be subjected to reduced air pressure as they are discharged from the conveyor tube through said depending discharge extremity.

"8. In a peanut combine a downwardly inclined screen on which the peanuts are adapted to be received, said screen having openings of a size to allow the peanuts to fall therethrough, a blower for producing flow of air over said screen for removing foreign matter from the peanuts, a generally horizontally disposed discharge pipe located below

said screen and extending laterally therefrom, a connection providing an inlet into one end portion of said discharge pipe through which peanuts falling through said screen are received, a conveyor tube connected to the other end portion of said discharge pipe, said conveyor tube extending upwardly at an angle and having a curved end portion terminating in a depending discharge extremity, and air venting means in the upper portion of said conveyor tube for the discharge of foreign matter and the release of air pressure whereby the peanuts will be subjected to reduced air pressure as they are discharged from the conveyor tube through said depending discharge extremity, said discharge extremity having multiple discharge openings and valve means for selectively directing the discharge through said openings."

An analysis of these claims shows the significant features to be: (1) a housing; (2) a vine rack with a vine discharging means at the rear of the combine; (3) a stepped pan which spreads the peanuts and moves them toward the rear of the combine; (4) a declining stepped screen with openings large enough to allow peanuts to fall therethrough; (5) a blower used to blow air through the screen to aid in the movement of the peanuts down the steps and also help clean dirt from the peanuts; (6) a flared member where peanuts may fall by gravity after passing through the stepped screen or after passing through the stemmer saws which are located below the end of the stepped screen; (7) a discharge pipe inclined upwardly toward the front of the combine and terminating in multiple discharge openings; (8) a second blower which moves the peanuts up the inclined portion of the discharge pipe; and (9) an air vent to reduce pressure so that peanuts flowing through the discharge pipe can be gathered without harm to the individual working with the collecting bags. With particular reference to these features, the first question that must be answered is whether any of them individually, or all of them as a combination, are anticipated by the prior art so as to render any or all of the claims of patent number 3,007,475 invalid in view of 35 U.S. C., section 103.

## PRIOR ART

Under 35 U.S.C., section 103, and the *Graham* case, which sets forth the test to be applied thereto, it is clear that all of the significant features of patent number 3,007,475 appear time and again in the prior art, and that Long has simply combined old elements, otherwise not patentable by themselves, into a new machine. An in-depth comparison of the prior art, with what Long claims, will reveal the lack of novelty and nonobviousness and hence the lack of invention of any single element.

Peanut combines are almost always enclosed in a housing of some kind. Examples of this are the Frick, Krause, Livermon, Case, Ronning, Landrum,[54] and both Good patents. All of these combines also have vine racks which feed to a vine discharging means at the rear of the machine. A structure similar to Long's "stepped *pan*," although called by a different name, can be found in the Frick,[55] Livermon,[56] Morris,[57] Lilliston,[58] and both Good[59] combines, and a structure similar to Long's "stepped *screen*," although also called by a different name, can readily be seen in

54. Defendant's exhibit No. 118.

55. Defendant's exhibit No. 82, item No. W 18329 (peanut grid pan).

56. Defendant's exhibits Nos. 52 and 88, item No. 62 (pan).

57. Defendant's exhibit No. 59, items No. 81 and 82 (platform).

58. Defendant's exhibit No. 56, item No. 44 (vibrating apron). This was in Lilliston's old carding type machine known as the "400" series.

59. Defendant's exhibits Nos. 50 and 51, item No. 17 (grid pan).

the Frick,[60] Case,[61] Landrum,[62] and Morris[63] combines. Practically every peanut combine known contains a blower which is used to aid in the cleaning process. In the Frick, Landrum, and Morris combines, this blower blows air through the screen structure to clean the peanuts of dirt and other foreign substances at that point. The flared member, or the focal point where the peanuts are collected after passing through the cleaning and separating processes, has its forerunner in the Frick,[64] Livermon,[65] and both Good[66] combines. Finally, the system employed by Long which includes a discharge pipe with a second blower and an air vent is almost an exact replica of the Boesch[67] patent and is apparently similar to the structure found in the Frick[68] combine.

From the foregoing survey of the prior art as compared with each element in the patent, it is clear that each feature of the patent was obvious to one skilled in the art and therefore would not be patentable by itself. It is equally clear, however, that if invention can be found in the combination of these old elements, then the patent is valid.[69] In order to show invention in patent number 3,007,475, the plaintiff contends that the declining of the stepped screen, the collecting point having a flared member, and the pneumatic conveyor system are new and significantly important ideas and the fact that these are all added into one combination with the other old elements warrants credit for an invention. Under the authority of *A & P* and other cases heretofore cited, we cannot agree

with the plaintiff, but rather hold that the arrangement of parts here was only one of mechanical skill and cannot be marked with the stamp of invention.

In addition to the fact that every important feature of patent number 3,007,475 appears in the prior art, no new and different function or result can be found in any of these elements in Long's machine, either separately or as a combination. The housing and vine discharging means both serve the obvious purpose indicated by their names in all combines where they appear, which are many. The stepped pan, or similar structure, is also a standard part of a peanut combine and, as used by Long, is employed to aid in the spreading and movement of newly threshed peanuts to the cleaning portion and ultimately the collecting part of the combine. The stepped screen, or its equivalent, also serves the same purpose of aiding in the cleaning process in Long's machine as in the other combines which are part of the prior art. Another usual feature in peanut combines is a blower which, as in Long's combine, is used primarily to clean dirt from the peanuts as they move toward the stemmer saws. Finally the conveyor system with the blower, inclined pipe, and air vent is exactly the same structure and serves the same purpose as the Boesch conveyor which is to provide a safe means for getting the peanuts from the trough, or wherever they are collected after passing through the cleaning processes, to the bags.

Of the three aforementioned elements which the plaintiff contends makes his

60. Defendant's exhibit No. 82, item No. W 19565 (cleaner grid pan).

61. Defendant's exhibits Nos. 33 and 71.

62. Defendant's exhibit No. 118, figure No. 4 (peanut chaffer).

63. Defendant's exhibit No. 59, items Nos. 96 and 99 (grate).

64. Defendant's exhibit No. 82, item No. W 19588 (peanut auger trough assembly).

65. Defendant's exhibit No. 52, item No. 99 (chute).

66. Defendant's exhibits Nos. 50 and 51, item No. 21 (peanut delivery auger or discharge conveyor trough).

67. Defendant's exhibits Nos. 60, 60A, and 60B. See also the Everett conveyor, defendant's exhibit No. 35.

68. T.R. pp. 122–123.

69. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177 (1881).

machine different from the prior art, Long mainly relies on what he calls a "downwardly inclined stepped screen." Although it is true that the plaintiff has the first machine with a stepped screen inclined toward the rear, it has already been shown that this is not the first combine to contain a stepped screen; nor is it the first combine where the screen works in connection with a blower in the cleaning process, which Long alleges is one of the advantages of his particular arrangement. Furthermore, this is not the first combine which has suggested a slanting screen. In fact, in some combines the stepped screen, although usually horizontal, was made so that it could be adjusted to a slanting position.[70] In others, the screen was made to be slanted but slanted toward the front rather than toward the rear.[71] In light of this evidence, we conclude that not only was this not a novel idea, but also that it was obvious to one of ordinary skill in the art. If anything, this arrangement only showed mechanical ability which, of course, will not suffice for invention.

The second feature which the plaintiff relies on to qualify the rear part of the combine for an invention is the flared member employed at the collecting point to guide the cleansed peanuts into the trough. This was nothing new, however, for a similar structure can be found in other combines, and it appears that the Frick combine uses practically the same configuration. Additionally, the nature of this structure is such that it would be obvious to use in this situation. Being similar to a funnel, it does what a funnel always does and its employment here, however skillful, was not inventive.

The third feature that Long relies on is his use of a pneumatic conveyor in this peanut combine. As the plaintiff himself indicated, however, the use of such a conveyor is not new to peanut combines and, in fact, is used in the Massey-Harris machine.[72] Furthermore, Long himself admitted that this was "like all pneumatic conveyors that I've seen used where you released the air and then released the material that you're blowing. There would be no other way to do it."[73] Assuming that the plaintiff, as an inventor, is at least one of ordinary skill in the art, it is clear that the use of the pneumatic conveyor here was obvious.

In concluding that patent number 3,007,475 is anticipated by the prior art and therefore invalid, it is noted that every significant feature of this patent appears not only in various combines throughout this history of the art, but also that they all appear in a single device in the prior art—the Frick combine, which, incidentally, was not before the patent examiner when Long's application was being processed. These points are particularly significant here in light of the factual situation that arose in *Graham*. There the Supreme Court examined the prior art and found that every essential element of the claimed patent was part of the prior art. In fact, the Court found that all of the items were included in the same patent (which was not before the patent examiner) except that two of the elements were reversed. Even so, however, the Court noted that their mechanical operation was identical and the same function was served. The patent was held invalid. In following the reasoning and result of *Graham* and holding that all

---

70. Defendant's expert witness, Dalbert Shefte, testified that both the Case patent (defendant's exhibits Nos. 21 through 34), and the old Lilliston patent (defendant's exhibit No. 56), had screens which could be adjusted to vary the inclination. T.R. p. 1074.

71. Shefte testified that this is shown in both the Eisenhart (defendant's ex-

hibit No. 53) and Carroll (defendant's exhibit No. 125) patents. T.R. p. 1075. It also appears that the Frick combine shows this although the slant, if any, is very slight. Defendant's exhibit No. 82.

72. T.R. pp. 122–123.

73. T.R. p. 141.

eight claims of patent number 3,007,475 are invalid as anticipated by the prior art, it is also appropriate to conclude, as the Supreme Court did, that the patent in question "presents no operative mechanical distinctions, much less non-obvious differences." [74]

## INDEFINITENESS OF THE CLAIMS

The second defense that Lilliston raises is that patent number 3,007,475 is invalid by reason of being vague, indefinite, and incomplete in light of 35 U.S.C., section 112. In making this contention, Lilliston primarily relies on the configuration and elements of the discharge system and argues that there is an inconsistency between claims one and two and claims five, seven and eight. Additionally, the defendant asserts that there is a discrepancy in the labeling of the stepped screen throughout the various claims. For the reasons stated below, the Court rejects these arguments and holds for the plaintiff on these points.

■ A comparison of the wording of claims one and two and claims five, seven and eight shows that while in claims one and two the discharge pipe is described as extending all the way from below the flared member up to the discharge opening, claims five, seven and eight describe the discharge pipe as extending only to the conveyor tube, which in turn, extends to the discharge opening. From the wording of the claims, therefore, it is not clear whether the pipe which extends upwardly and toward the front of the combine is supposed to be called the discharge pipe or the conveyor tube. The descriptions which accompany the claims, however, reveal that

one and the same element is referred to here, and any confusion that would arise from the wording would be cleared up from a quick glance at the drawings.[75] Accordingly, we hold that one of ordinary skill could interpret the details of the discharge system and make use thereof. For the same reason the Court discards the contention of the defendant that in some claims the screen in question is referred to as an inclined screen, in others as a stepped screen, and in others simply as a screen. Suffice it to say that the drawing enclosed provides a clear view of the screen.[76] It is both inclined and stepped.

The defendant also contends that in claims five, seven and eight, an air vent is referred to as the means to reduce air pressure in the conveyor tube, but the means for creating this pressure—the second blower—is only mentioned in claims one and two. Lilliston submits, therefore, that these claims are invalid as incomplete. We do not agree, for not only do the words of the claims when taken together clearly indicate that this second blower is used to create the air pressure referred to, but also the drawings accompanying the patent disclose the blower, air vent, and conveyor, and the interrelation of these parts. One of ordinary skill in the art could make use of the discharge system as described. Both the substance and purpose of 35 U.S.C., section 112 have been met.

## BEST MODE CONTEMPLATED

In addition to the requirement that the specifications of a patent should be "in such full, clear, concise, and exact terms as to enable any person skilled in the art" to make use thereof, 35 U.S.C.,

---

74. Graham v. John Deere, Co., 383 U.S. 1, 26, 86 S.Ct. 384, 15 L.Ed.2d 545 (1966). See also, Fn. 24, *infra*.

75. Plaintiff's exhibit No. 2, figures 1, 2, 9 and 10. It is significant to note that this is a different result from the Court's holding with regard to the word "relatively" in patent number 2,974,467. There, even with the use of the drawings, it could not be clearly interpreted

what "relatively" meant with regard to the large threshing cylinder or the overall height of the combine. Here, however, whatever may be confusing about the wording in the claims quickly becomes clear with the use of the accompanying drawings.

76. Plaintiff's exhibit No. 2, figure 1, item 95.

section 112, also dictates that the specifications "shall set forth the best mode contemplated by the inventor of carrying out his invention." Lilliston contends that Long has not complied with these requirements of the statute in that he has not shown either in his specifications, claims, or drawings, the baffle which is necessary to form a venturi at the point where the peanuts are introduced into the air stream which is created by the second blower. Lilliston also alleges that not only was this a necessary element to make the discharge system operative, but also that Long knew this was the best way to get the peanuts into the air stream and yet still failed to show it in his patent.[77]

While we find that the baffle was indeed necessary to make this discharge system operative, even though one is not shown in the patent, it is clear that one of ordinary skill in the art to which this system relates would be able to make use of this system by the minor modification of adding the baffle.[78] Furthermore, it is apparent that the omission of the baffle in Long's patent was inadvertent. There is no indication whatsoever that Long tried to deceive anyone or conceal anything from the public and without any evidence along this line, the Court does not presume any deception.[79]

## INFRINGEMENT

Even assuming patent number 3,007,475 is valid over the prior art, the defendant submits that its combine is significantly different from Long's in several respects and, therefore, there is no infringement. The main differences which Lilliston relies on are that it has employed an auger trough instead of a discharge pipe and it has no structure similar to Long's stepped screen. Under the doctrine of equivalents set forth in *Graver* and covered earlier in this opinion, the Court finds that, assuming the patent in question is valid, there has clearly been infringement. Every element in the back end of Lilliston's combine is substantially similar to corresponding elements in Long's combine in structure, function, and result. Since Long's patent is so clearly invalid as anticipated by the prior art, however, no further discussion on this point is necessary.

## COMMERCIAL SUCCESS

In holding patent number 2,974,467 and patent number 3,007,475 invalid as anticipated by the prior art, we take cognizance of the fact that some of the combines considered here as part of the prior art had been discontinued around the time that Long received his patent.[80] We are also aware of the decision in Reynolds v. Whitin Machine Works, 167 F.2d 78 (4 Cir., 1948), cert. denied, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948). In that case the defendant relied principally on one patent over one hundred years old and two others each over fifty years old to invalidate the plaintiff's patent by a showing of prior art anticipation. In upholding the validity of the patent, the United States Court of Appeals for the Fourth Circuit said, "Patents for useful inventions ought not to be invalidated and held for naught because of such excursions into the boneyard of failures and abandoned experiments."

Although *Reynolds* would tend to support the plaintiff's contention that the lack of success of former patents indicates the validity of the plaintiff's pat-

---

77. Compare defendant's exhibits Nos. 102.17 and 102.38 with plaintiff's exhibit No. 2, figure 10.

78. Defendant's expert, Shefte, testified to this effect at T.R. p. 1052.

79. Dashiell v. Grosvenor, 162 U.S. 425, 16 S.Ct. 805, 40 L.Ed. 1025 (1896).

80. See testimony of plaintiff's witness J. M. Wagner, T.R. pp. 157–160, and defendant's witness William G. Moore, T.R. pp. 773–776, 783, 815.

ent, it is necessary to distinguish that case from the case at hand on the following grounds. First, it must be noted that the basis of the *Reynolds* decision was that there was a lack of novelty. As has been seen earlier, Graham v. John Deere Co., supra, explicitly states that when 35 U.S.C., section 103, was enacted in 1952, the test of nonobviousness was added to the previously established tests of novelty and utility which must be met in upholding the validity of a patent. It is under the test of nonobviousness that the Court here invalidates the patents in question, and therefore the basis for decision in *Reynolds* cannot be applied here. Secondly, in our case most of the patents and combines of the prior art which are being dealt with were created within a decade of the time when Long's combine was patented. During this time new ideas were rapidly being developed and reevaluated in the field of peanut combines. In the development of successive machines, and particularly in an area crowded with patents as the peanut combine field is, it is clear to the Court that as new ideas and devices are developed, older ones are phased out or may even prove utterly worthless. This may well be what happened here, and to allow the knowledge that the older patents imparted to then be patented would be to withdraw what is readily known and disclosed from the public domain contrary to the dictates of the constitution.[81]

▮▮▮ We are also mindful of the fact that while many peanut combines previous to Long's were not commercially feasible, Long's machine has enjoyed substantial commercial success. The law is well-settled, however, that while commercial success may be a relevant factor in determining obviousness or nonobviousness,[82] without invention it will not make patentability.[83] This point was clearly enunciated in the recent case of Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). That case dealt with the validity of a patent for a machine which combined four elements well known in the art of laying blacktop. In addition to a layer, spreader, and a screed, the patentee claimed that the inclusion of a radiant heat burner, whose object was to heat the edge of the preceding section of asphalt and thus enable the newly laid section to mold into the old slab with no resulting damage to the asphalt or corrosion in the "cold spot" area, constituted an invention. The Supreme Court first noted that radiant heat burners had been used in working with asphalt for over fifty years, and that its main function in this patent; i. e. softening the surface of the asphalt without burning it, was the same as it always had been. In answer to the question of whether the combination of these old elements created a valid patent, the Supreme Court said in a unanimous decision:

"A combination of elements may result in an effect greater than the sum of the several effects taken separately. No such synergistic result is argued here. It is, however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But those matters 'without in-

81. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965).

82. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir.,

1961); Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir., 1960); Otto v. Koppers Co., Inc., 246 F.2d 789 (4 Cir., 1957).

83. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

vention will not make patentability.' "[84]

## SUMMARY AND CONCLUSIONS

Patents numbers 2,974,467 and 3,007,475 are invalid under 35 U.S.C., section 103, as anticipated by the prior art. In essence, both of these patents involve a combination of old parts or elements well known in the art. Although these combinations are recognized as forming a commercially profitable machine, no new function, operation or result can be found in either combination. Hence, even with the positive aspects of Long's machine taken into consideration, we must find that each patent only evidences mechanical skill, but is not inventive and therefore not patentable. In addition to the overwhelming evidence of prior art and the cases cited herein which interpret section 103, it is also noted that at least four patents were not taken into consideration by the Patent Office. One, the Frick combine, is particularly important since almost every element of Long's patent can be found in Frick. Another, the Boesch patent, contains a discharge system almost identical to Long's. We hold, therefore, that the defendant has met its burden and the patents are invalid.

With regard only to patent number 2,974,467 the Court also finds this patent invalid under 35 U.S.C., section 112, as being vague and indefinite. Even assuming the validity of that patent, however, the Court finds there has been no infringement by the defendant. As to patent number 3,007,475, assuming the validity of it, the Court finds this would be infringed by the defendant.

A final judgment order will be entered upon presentation, after endorsement by counsel.

84. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969).